STATE OF NEBRASKA, APPELLEE, V.
DAVID L. DUNSTER, APPELLANT.

707 N.W.2d 412

Filed December 16, 2005.   No. S-05-021.

Jerry L. Soucie, of Nebraska Commission on Public Advocacy, for appellant.

Jon Bruning, Attorney General, and J. Kirk Brown, Solicitor General, for appellee.

HENDRY, C.J., WRIGHT, CONNOLLY, GERRARD, STEPHAN, McCORMACK, and MILLER-LERMAN, JJ.

CONNOLLY, J.

David L. Dunster appeals the district court's order denying his motion for new trial and motion to vacate his death sentence.

He contends that newly discovered evidence shows that he was not competent to plead guilty and represent himself in the initial proceeding. He also appeals the court's order denying the motion to vacate his death sentence as void ab initio. The court determined that regardless of the new evidence, Dunster was competent when he waived his rights and pled guilty. We affirm the court's order denying the motion for new trial. We dismiss Dunster's assignments of error concerning his death sentence, because a motion to vacate filed in the context of a special proceeding is not a recognized criminal procedure. We decline to recognize a new procedure when the postconviction statutes may be used to raise the issue.

## BACKGROUND

Dunster pled guilty to charges of first degree murder and use of a weapon to commit a felony. On January 26, 2000, after Dunster requested the death penalty, the court sentenced him to death on the murder charge and 20 years' imprisonment on the weapon charge. Dunster appealed, contending in part that the district court erred when it allowed him to proceed pro se and when it accepted his guilty pleas. We affirmed. See *State v. Dunster*, 262 Neb. 329, 631 N.W.2d 879 (2001) (*Dunster I*).

After we decided Dunster's appeal, the U.S. Supreme Court decided *Ring v. Arizona*, 536 U.S. 584, 122 S. Ct. 2428, 153 L. Ed. 2d 556 (2002), which required jury participation in imposing a death sentence. In November 2002, the Legislature enacted 2002 Neb. Laws, L.B. 1, to provide for procedures in accordance with *Ring*.

Previously, in November 2001, Dunster moved for a new trial, alleging newly discovered evidence. In October 2002, he filed a motion to vacate his death sentence based on *Ring*. He amended the motion in April 2003 to include an argument that L.B. 1 repealed previous death penalty statutes, which he alleged repealed his death sentence.

### MOTION FOR NEW TRIAL: PROCEEDINGS IN *DUNSTER I*

At the time of Dunster's trial and direct appeal, prisoners were prohibited access to their Department of Correctional Services (DCS) medical records. See Neb. Rev. Stat. § 83-178(2) (Reissue 1995). In 2001, the Legislature amended § 83-178 to allow access

to the records in certain circumstances. See Neb. Rev. Stat. § 83-178(2) (Cum. Supp. 2004). After receiving his records, Dunster alleged that information in them showed that he was incompetent to plead guilty and to proceed pro se at trial. Because Dunster's arguments about newly discovered evidence focus on the trial court's factual findings when Dunster entered his guilty pleas and was allowed to proceed pro se, we repeat and paraphrase pertinent facts from *Dunster I,* adding additional facts when necessary:

Sometime in the early morning hours of May 10, 1997, Dunster strangled his cellmate with an electrical cord. The cellmate's body was discovered later that day.

In July 1997, the district court appointed the Lancaster County public defender's office to represent Dunster. Attorney Michael Gooch from that office appeared on Dunster's behalf. Dunster stood mute at his November 1998 arraignment, and the court entered pleas of not guilty. In June 1999, the trial judge received a letter from Dunster requesting that the public defender's office be disqualified as his counsel.

The court held a hearing on the issues raised by Dunster's letter. In the letter, Dunster stated, " ' "I have instructed them [the public defender's office] not to investigate or present any mitigating evidence at the sentencing phase" . . . . "I've told my attorneys I do not want them investigating these issues, but they tell me that, notwithstanding my desires, they're going to investigate them anyway." ' " *Dunster I,* 262 Neb. at 333, 631 N.W.2d at 888. The court stated to Dunster, " '[Y]our feeling is that they're not following your directions, therefore you want them discharged.' Dunster responded, 'Exactly.' " *Id.* at 333-34, 631 N.W.2d at 888.

The court then began discussing the issue with Gooch. During this discussion, Dunster interjected, saying:

"[Dunster]: I think I can solve this whole thing.

"THE COURT: That would be nice.

"[Dunster]: Okay. Disqualify the public defenders; let me withdraw my plea of not guilty; I plead guilty and then you sentence me to death. That's what I'm requesting, because I'd rather have that than live the rest of my life in a cell. Okay?

> " . . . .
>
> "THE COURT: . . . Mr. Dunster, I would not unilaterally discharge the Public Defender's Office. You obviously have a right to fire whomever you want to, and then I would have to make a decision whether — and if you tell me, 'I'm going to go ahead and represent myself,' then I would have to make a decision on whether you're aware of certain things and whether your decision is freely, voluntarily, knowingly and intelligently made on proceeding to represent yourself.
>
> " . . . I want you to have an opportunity to sit down and talk with Mr. Gooch . . . .
>
> " . . . .
>
> "[Dunster]: I will not discuss anything further with the Public Defender's Office."

*Id.* at 334, 631 N.W.2d at 888.

The court told Dunster that it would appoint another attorney to talk with him about the consequences of discharging the public defender's office and representing himself. Dunster responded, " 'Well, common sense tells me that's stupid to represent myself. I mean, I don't know enough about the law, but I know what I want and then that's it.' " *Id.* at 334, 631 N.W.2d at 888-89.

The court appointed the Nebraska Commission on Public Advocacy (NCPA) to advise Dunster on the consequences of discharging the public defender's office and representing himself. The hearing was continued to allow Dunster time to consult with the NCPA. Dunster later requested to withdraw "without prejudice" the issues raised in the June 8, 1999, letter. The court granted this request, and the public defender's office continued to represent Dunster.

In July 1999, a pretrial hearing commenced regarding motions Gooch had filed on Dunster's behalf. At the start of the hearing, Gooch informed the court that he would shortly be leaving the public defender's office and would not be available when Dunster's case came to trial. Dunster then requested that the NCPA immediately be appointed as his counsel. The court denied Dunster's request and determined that Dunster's case would be reassigned to a different public defender. Dunster

responded, " 'It's a merry-go-round with attorneys . . . I don't get along with the Public Defender's Office.' " *Id.* at 335, 631 N.W.2d at 889. The court reminded Dunster that the issue was not whether Dunster liked the public defender's office, but whether " 'the attorney can afford you effective counsel.' " *Id.*

Dunster later presented the court with two pro se motions. The first requested that the public defender's office be discharged and that Dunster be allowed to proceed pro se. The second requested the court to allow Dunster to withdraw his not guilty pleas and plead guilty to first degree murder and use of a weapon to commit a felony. The court spent the rest of the morning and a portion of the afternoon advising and questioning Dunster regarding his motions.

The court questioned Dunster concerning his reasons for discharging the public defender's office and advised him of his right to counsel and of the possible consequences of any decision to forgo the aid of counsel. The court also advised Dunster of the charges against him and the possible penalties, including the possible imposition of the death penalty if his guilty plea to first degree murder was accepted. Dunster responded that he was aware of his rights, the charges, and the possible penalties for his crimes. In addition, the court questioned Dunster concerning his understanding of the jury process and a variety of the consequences of proceeding pro se. Dunster stated he understood the issues and that he had discussed his decision with two attorneys.

The court further questioned Dunster as follows:

"THE COURT: . . . Are you now under the influence of any alcohol, drugs, narcotics or other pills?.

"[Dunster]: Yeah, medication.

". . . .

"[Q.] Does the medication affect your ability to understand what's going on around you?

"[A.] No.

"[Q.] Does it make you groggy or anything like that?

"[A.] No.

"[Q.] What effect does it have on you?

"[A.] None.

"[Q.] None?

"[A.] None.

"[Q.] None that you're aware of, at least?

"[A.] None that I'm aware of."

*Id.* at 336, 631 N.W.2d at 890.

Dunster stated that he was taking "mega-doses" of Prozac, "Depitol" (Depakote), and Librium. Dunster explained: " 'I weigh 300 pounds, so I — when I say mega-doses, they would be different than what they give her [the prosecutor] and what they give me.' " *Id.* at 337, 631 N.W.2d at 890. The court then asked, " 'What effect do those have on you?' " and Dunster responded, " 'None.' " *Id.* The court further asked, " 'Do they affect your ability to understand what's going on around you?' " and Dunster responded, " 'No.' " *Id.*

The court granted the motion to discharge the public defender's office, finding that Dunster knowingly, intelligently, and voluntarily waived his right to counsel. The court then appointed the public defender's office as standby counsel.

The court explained to Dunster that if he pled guilty to the charges filed against him, he would be waiving his right to confront witnesses against him, the right to a jury trial, and the privilege against self-incrimination. Dunster indicated that he understood these rights and wanted to plead guilty.

The court then read aloud the charges against Dunster. The court then asked Dunster, " 'Did this happen on or about May 10th, 1997?' " *Id.* at 337-38, 631 N.W.2d at 891. Dunster responded that it had and described details of the crime. The State then presented evidence to support the factual basis for Dunster's guilty pleas. At the conclusion of the hearing on July 14, 1999, the court accepted Dunster's pleas and found Dunster guilty of first degree murder and use of a weapon to commit a felony.

The court next explained that the proceedings would next move to the sentencing phase and how the sentencing hearing would proceed. The court stated, " 'Mr. Dunster, we've gone from phase 1 of this case, that is the guilt/innocence phase, now to the sentencing phase. I strongly urge you to have an attorney, to step aside and let the public defender represent you with respect to this phase.' " *Id.* at 338, 631 N.W.2d at 891. Dunster responded, " 'No.' " *Id.* The court also explained that Dunster would have the right at the sentencing hearing to present any mitigating evidence. Dunster stated, " 'I'm not going to present

any evidence.' " *Id.* Dunster also expressed his impatience with the time involved before sentencing, stating:

> "And I'm really getting pissed that you keep wanting to drag this out over and over, you know.
>
> . . . .
>
> ". . . I can't believe that it's so hard. I mean, you have suicide by cop, and I'm trying to commit suicide by state, and it is difficult. I could — it is really a pain in the ass to get you people to kill me."

*Id.*

Over Dunster's objections, the court stated that it would order a presentence report for purposes of sentencing. On July 28, 1999, the trial court wrote to the probation officer who was compiling the presentence report, stating:

> "[I]t is my understanding [DCS] has information in its possession it is willing to release to you for inclusion as part of the presentence investigation report you are preparing in [State v. Dunster]; however, [DCS] is concerned about access to the information.
>
> "I have reviewed NEB. REV. STAT. § 83-178(2) (Reissue 1994) and have decided to have you obtain the information and make it a separate attachment to your report. The attachment will only be accessible to me, without written order of the court, after notice to the parties in this case and [DCS]. If a final decision is appealed, the attachment . . . is not to be released without authorization from the appellate court."

*Dunster I,* 262 Neb. at 338-39, 631 N.W.2d at 891. The letter indicates that a copy of this correspondence was also sent to Dunster, Gooch, and the prosecutor.

During the week of August 6, 1999, before the sentencing hearing, Dunster indicated to standby counsel that he would like the public defender's office reappointed as his attorney. On August 6, a hearing was held to consider Dunster's request. Dunster stated that his former decision to proceed pro se and plead guilty had been impaired by the medications he was taking. The court reappointed the public defender's office to represent Dunster and continued any further proceedings until August 10.

On August 10, 1999, attorney Robert Hays from the public defender's office appeared on Dunster's behalf. Hays informed the court that he had been assigned to Dunster's case and had filed a motion on Dunster's behalf requesting a competency examination. The court granted the motion and held a competency hearing.

At the start of this hearing, Dunster made an oral motion to once again discharge the public defender's office. The court took the motion under advisement, pending the result of the competency hearing.

Dr. Y. Scott Moore, a psychiatrist, testified at the hearing. Moore testified that he had conducted a 2-hour interview with Dunster and had reviewed Dunster's medical records. Moore stated that Dunster was " 'quite well oriented' " and that " '[h]e knows . . . what the charge is [and] the possibilities of consequences if he should go to trial.' " *Id.* at 339, 631 N.W.2d at 892. Moore further stated, " 'I found absolutely no spot in which Mr. Dunster is not in contact with reality. . . . Mr. Dunster . . . can come up with a defense if he wishes. I believe that he can confer with his attorney if he chooses to do so.' " *Id.*

The court asked Moore about the medications Dunster was taking. Moore testified that Dunster was taking Depakote " 'for smoothing a mood,' " Prozac " 'to help smooth mood in people who seem to be quite volatile,' " and Librium " 'to help Mr. Dunster sleep in the evenings.' " *Id.* at 339-40, 631 N.W.2d at 892. Regarding these medications, Moore testified that he " 'saw absolutely no effect on [Dunster] of being able to interfere with his ability to answer questions or to deal with the realities of the moment.' " *Id.* at 340, 631 N.W.2d at 892. Moore also noted that Dunster was receiving a low dosage of these medications. Hays did not ask Moore any questions.

At the conclusion of the evidence, the court determined that Dunster was competent. The court then considered Dunster's oral motion to proceed pro se, questioning Dunster about his reasons for wanting to discharge the public defender's office a second time. Dunster advised the court that he was dissatisfied with the public defender's office because it wanted him to withdraw his guilty pleas and go to trial, while Dunster wanted to proceed to sentencing. Dunster also stated that he preferred being able to

speak for himself, rather than having counsel speak on his behalf. After informing Dunster of his rights, the court found that his second waiver of counsel was made knowingly, intelligently, and voluntarily. The court then granted Dunster's second motion to discharge the public defender's office and reappointed that office as standby counsel.

Dunster's sentencing hearing was conducted on November 22, 1999. Dunster appeared pro se, with Hays present as standby counsel. The court discussed the information it had received which it would consider for purposes of sentencing. The court stated it would consider Dunster's presentence investigation report contained in three bound notebooks. The court also informed the parties that the presentence investigation report included confidential mental health information from DCS. The court noted that because access to this kind of information was restricted, this mental health information would not be released to anyone unless a motion was made and a hearing held. The court also stated that it would consider the report prepared by Moore regarding Dunster's competency.

Before the State began presenting evidence, the court again urged Dunster to reconsider his decision to proceed pro se, stating:

> "THE COURT: Mr. Dunster, I have previously advised you on numerous occasions, and I know you think, probably, too many, of your right to be represented by counsel. I'm aware that, at least in my opinion, you understand that right. I strongly urge you again, sir, at this time, to accept representation by the Public Defender's Office to represent you in this sentencing phase. Do you understand that?
>
> "[Dunster]: Yes.
>
> "[Q.]: Do you wish to have that done?
>
> "[A.]: No.
>
> "[Q.]: You still want to go on your own behalf?
>
> "[A.]: Yes."

*Id.* at 341, 631 N.W.2d at 893.

The State then presented evidence in support of the single aggravating circumstance asserted by the State that Dunster had been previously convicted twice of first degree murder.

At the conclusion of the State's evidence, the court asked Dunster if he had any evidence to present. Dunster stated he did not, affirmed that Hays had been available to discuss the issue with him, and referred to a letter Dunster had sent to the court. In that letter, Dunster wrote that he was looking forward to the sentencing hearing and saw the possibility of a death sentence as " 'my parole & pardon all in one.' " *Id.* at 342, 631 N.W.2d at 893. In closing, Dunster told the court, " 'The position I'm in today is — I put myself there. I take full responsibility for it. . . . I'd rather just be executed than spend another day in prison.' " *Id.* at 342, 631 N.W.2d at 894.

The court issued its sentencing order on January 26, 2000. Dunster's appeal was automatically filed with this court, and the NCPA was appointed to represent Dunster on appeal. During the pendency of the appeal, Dunster wrote a letter to this court indicating that he no longer wanted to be executed.

After the appeal was docketed, but before oral argument, we requested that the district six probation office forward the confidential DCS records, which were omitted from the report previously sent to this court, and the parties were granted access to it.

We affirmed, concluding that the record showed Dunster's competency and that his actions were made knowingly, intelligently, and voluntarily. We also determined that Dunster was not denied effective assistance of counsel at his competency hearing when Hays asked no questions of Moore, because there was no prejudice when the court questioned Moore on the pertinent issues. We overruled Dunster's motion for a rehearing. *Dunster I.*

### MOTION FOR NEW TRIAL: MOTION
### AND EVIDENTIARY HEARING

Dunster's motion for new trial focuses on the release of his medical records from DCS. The record shows that some, but not all, of the records were available to the court at the time of trial. Dunster alleged that the records show that he had serious, life-threatening, and previously undiagnosed conditions that materially affected his ability to knowingly, voluntarily, and intelligently waive his right to counsel. He also alleged that these conditions affected his understanding of his rights concerning his guilty pleas and his other constitutional rights. Dunster alleged

that these undiagnosed illnesses included: (1) chronic hepatitis C, diagnosed in November 2000; (2) type 2 diabetes mellitus, diagnosed in July 2001, causing unexplained numbness in the extremities, unexplained bleeding, mental confusion, and potentially death; (3) severe high blood pressure, diagnosed in July 2001; and (4) an acute psychotic episode, starting in February 2001, possibly triggered by medication prescribed by DCS.

Dunster alleged that the undiagnosed conditions were impossible for Moore to have considered at the time of Dunster's pleas and sentencing. He also alleged that had he known he was suffering from undiagnosed depression associated with chronic illness, prescribed improper medication, and suffered from undiagnosed conditions, that he would not have pled guilty and demanded a death sentence. At the evidentiary hearing on the motion for new trial, Moore testified and repeated that when he interviewed Dunster for the competency hearing, Dunster did not show any signs of confusion and was competent to ask the court to sentence him to death.

The district court found that the medications involved were related to Dunster's mood swings, depression, tension, dysphoria, and sleeping difficulties. Some medications were adjusted at times, and at times, Dunster refused to take the medications. Sometimes, Dunster reported problems with medications, and at other times, he stated that he felt adequately medicated. In June 1999, Dunster reported that he had adjusted to his medications and asked that he continue receiving them. The district court then found that Dunster, on all occasions while in court, was subjected to a complete examination by the court and was appropriately responsive. The court noted that his physical condition had deteriorated since sentencing and that his mental condition "ebbed and flowed" during the trial and sentencing period. But the court also found that when Dunster waived his right to representation and pled guilty, he was sufficiently aware of the consequences. Therefore, the court denied the motion for new trial.

## MOTION TO VACATE DEATH SENTENCE

After the motion to vacate was filed, we held that *Ring v. Arizona*, 536 U.S. 584, 122 S. Ct. 2428, 153 L. Ed. 2d 556 (2002), did not apply retroactively. See, *State v. Lotter*, 266 Neb.

245, 664 N.W.2d 892 (2003); *State v. Gales*, 265 Neb. 598, 658 N.W.2d 604 (2003). In addition, the U.S. Supreme Court held that the rule of law in *Ring* would not be applied retroactively to cases already final at the time of the *Ring* decision. *Schriro v. Summerlin*, 542 U.S. 348, 124 S. Ct. 2519, 159 L. Ed. 2d 442 (2004). Relying on *Lotter* and *Gales*, the district court denied the motion. Dunster appeals.

## ASSIGNMENTS OF ERROR

Dunster assigns, rephrased and consolidated, that the district court erred by failing to (1) grant a new trial because of newly discovered evidence and (2) vacate his death sentence, because 2002 Neb. Laws, L.B. 1, repealed death as a punishment, thus, the court lacked jurisdiction to impose a death sentence, and because the indictment did not allege all essential elements of capital murder. Dunster also assigns that this court committed plain error on direct appeal by failing to apply a presumption of prejudice when it determined that he was not denied effective assistance of counsel at his competency hearing.

## STANDARD OF REVIEW

■ A trial court's order denying a motion for new trial is reviewed for an abuse of discretion. See *State v. Atwater*, 245 Neb. 746, 515 N.W.2d 431 (1994).

■ When dispositive issues on appeal present questions of law, an appellate court has an obligation to reach an independent conclusion irrespective of the decision made by the court below. *State v. Gass*, 269 Neb. 834, 697 N.W.2d 245 (2005).

## ANALYSIS

### MOTION FOR NEW TRIAL

Dunster argues that the information in his DCS medical records shows that he was incompetent to plead guilty and defend himself. He states that had he known of the undiagnosed medical issues, he would not have pled guilty.

■ A new trial can be granted on grounds materially affecting the substantial rights of the defendant, including "newly discovered evidence material for the defendant which he or she could not with reasonable diligence have discovered and produced at trial." See, Neb. Rev. Stat. § 29-2101(5) (Cum. Supp.

2004); *State v. Van*, 268 Neb. 814, 688 N.W.2d 600 (2004). A criminal defendant who seeks a new trial because of newly discovered evidence must show that if the evidence had been admitted at the former trial, it would probably have produced a substantially different result. See *State v. Faust*, 269 Neb. 749, 696 N.W.2d 420 (2005). We review the trial court's order denying Dunster's motion for a new trial for an abuse of discretion. See *Atwater, supra.*

Here, the trial court (1) carefully and thoroughly evaluated Dunster's competency to plead guilty and represent himself; (2) exercised caution, ensuring that Dunster knowingly and voluntarily waived his rights; and (3) made detailed findings concerning Dunster's health issues and behavior at the time. In its order denying the motion for new trial, the court made specific factual findings about Dunster's health at the time of his waivers. In particular, the court noted that although Dunster's condition had since deteriorated and that although he may have been suffering from undiagnosed elements at the time of his waivers, the fact remained he was sufficiently aware of his right to representation and the consequences of his decision to waive counsel and plead guilty.

The record shows that much of the newly discovered evidence concerned problems that arose after Dunster was sentenced. Further, in the light of the trial court's specific findings of fact, the record shows that had the evidence been available at the time of Dunster's waivers, the trial court would have reached the same conclusions. Therefore, the court did not abuse its discretion when it denied the motion for new trial.

## MOTION TO VACATE DEATH SENTENCE

Dunster contends (1) that L.B. 1 repealed the death penalty for first degree murder when the sentencing proceedings occurred before November 23, 2002, (2) that the previous statutes allowing a death sentence are facially unconstitutional under the 6th and 14th amendments, (3) that the trial court lacked subject matter jurisdiction to sentence him to death, and (4) that his death sentence is void ab initio. The State argues, however, that we lack jurisdiction over the claim because Dunster did not bring his motion to vacate in the context of an existing proceeding that

allows for further judicial review of a final criminal judgment. We agree that we lack jurisdiction over Dunster's motion to vacate his death sentence.

Dunster brought his motion to vacate as a separate special proceeding and specifically stated both in his brief and at oral argument that he did not file it under the postconviction statutes. He also has not filed it under other recognized procedures and admits that he is seeking to raise the issue in its own special proceeding. Thus, Dunster asks us to recognize a new procedure for the challenge of a purportedly void sentence.

We have held that when a criminal procedure is not authorized by statute, it is unavailable to a defendant in a criminal proceeding. See *State v. Louthan*, 257 Neb. 174, 595 N.W.2d 917 (1999). See, generally, *State v. El Tabech*, 259 Neb. 509, 610 N.W.2d 737 (2000) (declining to fashion procedure where no legislatively mandated one existed). Dunster, however, argues that language from cases stating that a void judgment may be attacked at any time in any proceeding allows him to file a motion separately from postconviction or habeas proceedings. See, e.g., *State v. Ryan*, 249 Neb. 218, 543 N.W.2d 128, *overruled on other grounds, State v. Burlison*, 255 Neb. 190, 583 N.W.2d 31 (1998).

But the cases Dunster relies on do not hold that a new procedure can be created to allege that a sentence is void. Instead, when discussing the ability to raise the issue in "any proceeding," those cases generally address that a void judgment can be raised without concerns of waiver when it was not previously raised. The cases involved the use of a legislatively authorized procedure such as a postconviction action and did not seek the recognition of a new special proceeding. We decline to extend that language to allow the creation of new procedures, especially when at least one existing procedure is available in which to raise the issue.

■ Here, the postconviction act specifically provides a procedure in which to file a motion seeking to vacate a sentence based on allegations that it is void. Neb. Rev. Stat. § 29-3001 (Reissue 1995). The addition of a new special procedure for raising issues of a void sentence is unnecessary and could lead to additional delay in the final resolution of cases. Therefore,

we decline to recognize a new special procedure for raising the issue of a void sentence. Because the issue was not raised in a recognized proceeding, the district court lacked jurisdiction over the claim. Thus, we also lack jurisdiction. Accordingly, we dismiss the assignments of error pertaining to the motion to vacate the sentence.

## PLAIN ERROR ON APPEAL

Dunster contends that this court plainly erred on direct appeal when we found that he was not denied effective assistance of counsel. He argues that we should have applied a presumption of prejudice from *United States v. Cronic*, 466 U.S. 648, 104 S. Ct. 2039, 80 L. Ed. 2d 657 (1984). Dunster filed a motion for rehearing after his first appeal which did not raise this issue, and we denied rehearing. We have reviewed this assignment of error and find it to be without merit.

## CONCLUSION

We determine that the district court did not abuse its discretion when it denied Dunster's motion for new trial. We decline to allow a new special procedure to raise claims that a sentence is void. Because Dunster did not raise his claims under an established procedure, we lack jurisdiction over the claims and do not reach those assignments of error. Finally, we reject Dunster's argument that we plainly erred on his direct appeal. Accordingly, we affirm in part, and in part dismiss.

AFFIRMED IN PART, AND IN PART DISMISSED.