Nebraska Supreme Court Online Library
www.nebraska.gov/apps-courts-epub/
09/15/2023 08:06 AM CDT

State of Nebraska, appellee, v.
Jeff Boppre, appellant.

___ N.W.2d ___

Filed September 15, 2023.    No. S-21-515.

1. **Motions for New Trial: Evidence: Appeal and Error.** An appellate court applies a de novo standard when reviewing a trial court's dismissal of a motion for new trial without conducting an evidentiary hearing, but it applies an abuse of discretion standard of review to appeals from motions for new trial denied after an evidentiary hearing.

2. **Postconviction: Motions for New Trial: Evidence.** When deciding whether an evidentiary hearing is required on a motion for new trial, trial courts have discretion to adopt reasonable prehearing procedures, just as they do under the Nebraska Postconviction Act.

3. **Criminal Law: Motions for New Trial: Evidence: Proof.** Neb. Rev. Stat. § 29-2101(5) (Reissue 2016) authorizes a new trial when the defendant satisfies a two-prong burden of proof. First, the defendant must show the evidence at issue has been newly discovered since trial, meaning the evidence existed at the time of trial but could not, with reasonable diligence, have been discovered and produced at trial. Second, the defendant must show the evidence materially affected his or her substantial rights, meaning it is so substantial that with it, a different verdict would probably have been reached at trial.

4. **Criminal Law: Motions for New Trial: Evidence.** If a motion for new trial under Neb. Rev. Stat. § 29-2101 (Reissue 2016) is not supported by the required evidence in the required form, a district court need not consider it further and may deny the motion without an evidentiary hearing.

5. **Criminal Law: Motions for New Trial: Limitations of Actions.** To have any effect, a motion for new trial must comply with the statutory time limitations. Neb. Rev. Stat. § 29-2103 (Reissue 2016) imposes different time limits on filing motions for new trial, depending on the statutory ground relied upon.

6. **Motions for New Trial: Legislature: Limitations of Actions: Evidence: Dismissal and Nonsuit.** If a motion for new trial fails to satisfy the statutory timeliness requirements imposed by the Legislature, a court need not consider it further and may dismiss it without an evidentiary hearing.

7. **Statutes: Legislature: Intent.** Components of a series or collection of statutes pertaining to a certain subject matter are in pari materia and should be conjunctively considered and construed to determine the intent of the Legislature so that different provisions are consistent, harmonious, and sensible.

8. **Criminal Law: Motions for New Trial.** Because the materiality provisions in Neb. Rev. Stat. §§ 29-2101 and 29-2102(2) (Reissue 2016) use nearly identical language, courts construe them consistently.

9. **Criminal Law: Motions for New Trial: Evidence: Proof.** When a defendant seeks a new trial on the ground of newly discovered evidence, the evidentiary hearing provisions of Neb. Rev. Stat. § 29-2102(2) (Reissue 2016) are satisfied if the motion and supporting affidavits, depositions, or oral testimony set forth sufficient facts which, if true, establish that (1) the new evidence existed at the time of trial but could not, with reasonable diligence, have been discovered and produced at trial and (2) such evidence is so substantial that with it, a different verdict would probably have been reached at trial.

10. **Criminal Law: Motions for New Trial: Evidence.** To properly analyze whether a defendant is entitled to an evidentiary hearing on claims of newly discovered evidence, a court considers, with respect to each claim, whether the motion and supporting documents (1) comport with the form and content requirements of Neb. Rev. Stat. §§ 29-2102 and 29-2103 (Reissue 2016); (2) comport with the timeliness requirements of § 29-2103; and (3) set forth facts which, if true, satisfy the evidentiary hearing requirements of § 29-2102(2). Because a defendant must satisfy all of these requirements to be entitled to an evidentiary hearing, a court may address the requirements in any order and the defendant's failure to satisfy one requirement makes it unnecessary for the court to address the others.

11. **Courts: Records.** It is not the court's duty to scour the record in search of facts that might support a claim.

12. **Motions for New Trial: Evidence.** Defendants filing a motion for new trial must make specific allegations, instead of mere conclusions of fact or law, to receive an evidentiary hearing.

13. ____: ____. To set forth sufficient facts, a motion for new trial based on newly discovered evidence should clearly and succinctly identify the evidence claimed to be newly discovered and should state with

particularity (1) the date on which such evidence was discovered; (2) why such evidence could not, with reasonable diligence, have been discovered and produced at trial; and (3) why such evidence is so substantial that with it, a different verdict would probably have been reached at trial.

14. **Appeal and Error.** To be considered by an appellate court, an alleged error must be both specifically assigned and specifically argued.

15. ____. Conclusory assertions unsupported by coherent analytical argument fail to satisfy the requirement of arguing an assigned error to obtain consideration by an appellate court.

16. **Criminal Law: Motions for New Trial: Evidence: Appeal and Error.** Even when the allegations in a motion for new trial set forth a narrative to support a new trial based on newly discovered evidence, the failure to accompany the motion with the type of supporting evidence required by Neb. Rev. Stat. § 29-2102(1) (Reissue 2016) provides a basis for dismissal without an evidentiary hearing.

17. **Criminal Law: Motions for New Trial: Evidence: Dismissal and Nonsuit.** The statutes authorizing motions for new trial in criminal cases do not permit a defendant to supplement the required supporting documents after receiving an order dismissing the motion without an evidentiary hearing.

18. **Actions: Appeal and Error.** Unlike the doctrines of claim and issue preclusion, which involve successive lawsuits, the law-of-the-case doctrine involves successive stages of one continuing lawsuit.

19. ____: ____. When it applies, the law-of-the-case doctrine operates to preclude reconsideration of substantially similar, if not identical, issues at successive stages of the same suit or prosecution.

20. ____: ____. The law-of-the-case doctrine promotes judicial efficiency and protects parties' settled expectations by preventing parties from relitigating settled issues within a single action.

21. ____: ____. Under the law-of-the-case doctrine, the holdings of an appellate court on questions presented to it in reviewing proceedings of the trial court become the law-of-the-case; those holdings conclusively settle, for purposes of that litigation, all matters ruled upon, either expressly or by necessary implication.

22. ____: ____. Courts will not apply the law-of-the-case doctrine if considerations of substantial justice suggest a reexamination of the issue is warranted, if materially and substantially different facts are presented, or if the applicable law has changed.

23. **Motions for New Trial: Evidence: Appeal and Error.** The law-of-the-case doctrine can apply in motions for new trial based on newly discovered evidence when the files and records in the case show that

the same or substantially similar evidence has already been considered by an appellate court in the same case and found not to support a new trial. However, just as in other case types, the doctrine should not be applied if the defendant presents materially and substantially different facts, when the applicable law has changed, or when considerations of substantial justice suggest a reexamination of the issue is warranted.

24. **Evidence: Words and Phrases.** Evidence is not "newly discovered" if its substance was known to the defendant at the time of trial.

Appeal from the District Court for Scotts Bluff County: Andrea D. Miller, Judge. Affirmed.

Bell Island, of Island Law Office, P.C., L.L.O., Thomas P. Frerichs, of Frerichs Law Office, P.C., Vanessa Potkin and Tara Thompson, of Innocence Project, and Andrea Butler and Sara Shaw Tatum, of Kirkland & Ellis, L.L.P., for appellant.

Douglas J. Peterson, Attorney General, and Stacy M. Foust for appellee.

Heavican, C.J., Miller-Lerman, Cassel, Stacy, Funke, and Papik, JJ.

Stacy, J.

In 1989, Jeff Boppre was convicted of two counts of first degree murder and four related felonies. His convictions were affirmed on direct appeal.[1] In the years since his direct appeal, Boppre has collaterally attacked his convictions through a series of motions for new trial and successive motions for postconviction relief. This appeal involves Boppre's third motion for new trial, which the district court dismissed without an evidentiary hearing. Because our de novo review shows that Boppre's operative motion and supporting documents did not entitle him to an evidentiary hearing, we affirm.

[1] *State v. Boppre*, 234 Neb. 922, 453 N.W.2d 406 (1990).

## I. BACKGROUND

In September 1988, Richard Valdez and Sharon Condon were shot and killed in a rural farmhouse north of Scottsbluff, Nebraska. In connection with those deaths, Boppre was charged with two counts of first degree murder, two counts of robbery, and two counts of using a firearm to commit a felony.

The evidence adduced at Boppre's jury trial was summarized in *State v. Boppre* (*Boppre I*).[2] To provide context for the various claims of newly discovered evidence that Boppre raises in his third motion for new trial, we quote at length from our summary of the evidence in *Boppre I*:

> Beginning in July 1988, Ricky Zogg began to supply Boppre with cocaine and marijuana which Zogg purchased from Richard Valdez, who occupied a house north of the town of Scottsbluff with his girlfriend, Sharon Condon. . . .
>
> About 2 months before the killings, Boppre suggested to Zogg, "Let's just take [Valdez'] money and his drugs, that way we don't have to buy it [any] more." Zogg agreed, and they planned to "[j]ust go in and shoot [Valdez]." Armed with guns, Boppre and Zogg twice went to Valdez' house but left before accomplishing their purpose.
>
> For 1 to 2 months before the killings, Boppre had been supplying Kenard Wasmer and Alan Niemann with cocaine which he had been purchasing from Valdez. On the evening before the killings, September 18, 1988, Boppre acquired some cocaine from Valdez at Niemann's request. Boppre met Niemann at a mobile home which Niemann and Wasmer shared, and Boppre and Niemann used the cocaine. During the course of the evening, Boppre and Niemann went to Valdez' house several more times to buy more cocaine. Each time, they

---

[2] *Id.*

acquired about a quarter or half gram of the substance and shared it with Wasmer before returning to Valdez' for more.

Sometime after midnight on September 19, Boppre suggested to Wasmer and Niemann, "Let's just go blow [Valdez] away." According to Wasmer, Boppre "looked at [Niemann] and asked [Niemann] if he'd go do it with him and [Niemann] said no, that he couldn't do it, he couldn't just shoot somebody. And he kept trying to get [Niemann] to do it and [Niemann] kept saying no and he called him a pussy and asked me, he looked at me and said, 'Come on, Wasmer, I know you can do it.' I told him, I said, 'Dude, the guy has never done nothing to me, I don't even know the man, I'm not going to go do something to him.'"

Boppre told them, "Well, I'll go do it myself then," and walked out the door. Niemann followed Boppre, telling Wasmer, "I'm going to go talk him out of it." Wasmer remained at the trailer.

Boppre and Niemann went back out to Valdez', where Boppre bought a quarter gram of cocaine and they left. After Boppre and Niemann used the cocaine, Boppre drove to his father's house, where he was living, went inside, changed clothes, and got a gun. [Boppre and Niemann] then returned to Valdez' house, and Boppre got out of the vehicle and knocked on the door. According to Niemann, he heard a man's voice yell, "Who is it?" After Boppre identified himself, the door opened and Niemann heard "a loud, 'Oh,' something, 'Oh God, oh, shit.'" Niemann then heard two shots, saw Boppre "jump up into the house," arms aiming downward, and then heard a series of additional shots.

Niemann went into the house and found Valdez lying on his back on the kitchen floor with his head and shoulders in the middle of the doorway between the kitchen and living room. As Niemann was leaving the house,

Valdez rolled onto his right side. Boppre came out of the house and reloaded his gun, saying, "[T]here couldn't be any witnesses." Boppre then went back inside the house, and Niemann heard a woman's high-pitched voice and a series of still more shots. Boppre came out of the house with several items in his hands and then went back into the house and knocked out the kitchen light with a hammer. While traveling back to Niemann's and Wasmer's trailer, Boppre told Niemann, "[Y]ou should have seen it. . . . You should have seen that bitch plead for her life."

. . . .

At Boppre's suggestion, Wasmer and Niemann agreed to travel to Phoenix, Arizona, with Boppre, where they could use the money they took from Valdez to acquire a considerable amount of cocaine. They put several of the things they had stolen into the trunk of Boppre's vehicle, Boppre placed the gun he had used for the killings under the front seat of the vehicle, and the three left. Over Boppre's relevance objections, Wasmer was allowed to testify that on their way to Phoenix, Boppre discussed stopping somewhere to buy more shells for the gun and "was talking about going into [convenience] stores, robbing them and killing whoever was behind the cash register or in the store." This prompted Wasmer to dismantle the gun and throw pieces of it out the window of the vehicle "so they couldn't be replaced" "[t]o keep anybody else from being killed with that gun." . . .

. . . .

Near Gallup, New Mexico, Boppre decided to dispose of the gun. According to Wasmer, they drove out of Gallup for "a ways and [Boppre] spotted . . . quite a big washout beside the road. We stopped, pulled over, [Boppre] got the gun out of the car, we all jumped over the fence, I walked over to the edge of it, stopped . . . [Boppre] and [Niemann] walked on down farther

and stayed there for a few minutes, not very long, and then came back, we got in the car and left." Niemann testified similarly that to dispose of the gun, they crossed over a fence into a ravine by the side of the road and that Boppre threw the gun into one mud puddle and the gun clip into another puddle.

The morning after the killings, Condon's body was found in the bedroom of the Valdez house, and Valdez' body was found in the kitchen near the doorway into the living room. According to Niemann, who reviewed a picture of Valdez' body as found, Valdez' body was discovered in a different position than when he last saw it. Law enforcement personnel found four shell casings and seven bullets in and around Valdez' body and two shell casings and two bullets around Condon's body. Pieces of glass from a broken light bulb were discovered in the kitchen. . . .

The district court received into evidence, over Boppre's hearsay objections, pictures which portray writing on the floor near where Valdez' body was found and writing on the casement of the door between the kitchen and living room. As depicted in the pictures, the letters "J-F-F B-O-P-E" were written in white grease on the floor by the left side of Valdez' body, and the letters "J-E-F-F" were written toward the bottom of the side of the casement nearer to Valdez' body within reach of the body's right hand.

Police Lt. Robert Kinsey testified that there "appear[ed] to be blood" on the side of the casement closest to Valdez and that the letters written on the door casement appeared to be written in blood. . . . Police Det. Mark Overman corroborated Kinsey's testimony, saying that the letters on the side of the door casement nearer to Valdez were written in what "appear[ed] to be blood." Although Boppre objected, Overman was allowed to

further testify that it appeared someone wrote the markings on the door casement with a finger.

When Valdez was found, there was white grease present on the index and middle fingers of his right hand and blood present on both of his hands. Valdez' brother testified that Valdez was right-handed. A nearly empty tube of white "lubriplate gear grease" was discovered under Valdez' body. According to a criminalist who testified for the State, the substance in the tube, on the floor, and on Valdez' fingers was "similar and could have originated from a common source." A documents examiner for the Nebraska State Patrol opined that the writing on the floor in grease "was consistent with having been written with a human finger," but testified that the writing was of insufficient quality and quantity for a positive identification of the writer to be made.

The pathologist who performed the autopsies on the two victims discovered four gunshot entrance wounds on Valdez' chest, abdomen, and left arm. According to the pathologist, Valdez died from the gunshot wounds to his chest and abdomen, "which resulted in massive internal damage to the organs" in those areas. The pathologist also opined that an individual with injuries such as Valdez' would live 15 minutes after the wounds were received and could have retained consciousness for 10 to 15 minutes. The pathologist was of the further opinion that it was possible that Valdez could have moved around and written something on the floor and wall for 5 to 15 minutes after receiving the wounds.

. . . .

A pathologist testifying on Boppre's behalf expressed the view that it was "highly unlikely that [Valdez] would have been physically capable of writing the descriptions" which were discovered next to his body. He opined that a person who sustained the injuries Valdez sustained "would have not remained conscious longer than

probably three minutes and probably would have died within the next five or six minutes."

Just after the killings, Boppre's father told law enforcement personnel that Boppre owned a .32-caliber handgun. Although the handgun could not be located in the father's house, the father showed the officers an area southwest of his residence where Boppre practiced shooting at targets with the gun, and allowed them to pick up some .32-caliber shell casings which were lying on the ground.

With Niemann's and Wasmer's help, law enforcement personnel discovered the .32-caliber handgun in the canyon near Gallup, New Mexico, where Boppre had thrown it. The State's ballistics expert described the gun as an LA Industrial Orbea-Eibar .32-caliber semiautomatic pistol. When found, the gun was missing several parts, including a thumb latch safety, the disconnector, the hammer pin, and the sear spring.

. . . .

The State's ballistics expert compared the shell casings found in Boppre's father's yard and those found at Valdez' house with shell casings which he acquired from his own test firing of the gun the police recovered near Gallup. He determined that the shell casings which were found at the Boppre and Valdez residences were all fired from the gun the police recovered near Gallup. He also compared the bullets found at the Valdez residence and those he test fired from the gun and determined that the bullets found at the Valdez residence were fired from the gun the police found. . . .

Michael Neu, who was incarcerated in the Scotts Bluff County jail at the same time as Boppre, testified, over Boppre's objections, that he "built up a situation of trust in regard to [himself] and . . . Boppre," that Boppre told him "Mr. Valdez couldn't have wr[itten] the name on the floor" because Valdez "was shot and he was dead

instantly," and that Boppre said, "You ought to heard the bitch beg for mercy, beg for her life."[3]

In March 1989, the jury returned guilty verdicts on all counts. Boppre was sentenced to consecutive terms of life imprisonment on the murder convictions and to indeterminate terms of imprisonment on the remaining convictions. We affirmed Boppre's convictions and sentences on direct appeal.[4]

## 1. Prior Collateral Attacks on Convictions

After Boppre's judgment and sentences became final, he filed a series of motions in his criminal case collaterally attacking the judgment. We summarize that procedural history now and, where appropriate, provide additional detail later in our analysis.

### (a) First Motion for New Trial

Boppre filed his first motion for new trial in March 1992, asserting several grounds, including newly discovered evidence and prosecutorial misconduct.[5] The prosecutorial misconduct claim was based on the State's alleged failure to disclose the existence of "M.M.," a young woman whom Boppre claimed was a material witness to the murders. In support of this claim, Boppre alleged that at the time of the murders, M.M. was a high school student who told some of her classmates that she was hiding inside the Valdez house when the murders occurred. M.M. reportedly said that she heard three male voices and that she was familiar with Boppre and "'knew it wasn't his voice.'"[6] When police learned of M.M.'s statement, they interviewed her. She admitted telling classmates that she was hiding inside the Valdez house when the

---

[3] *Id*. at 925-932, 453 N.W.2d at 414-17.

[4] *Boppre I, supra* note 1.

[5] See *State v. Boppre*, 243 Neb. 908, 503 N.W.2d 526 (1993).

[6] *Id.* at 914, 503 N.W.2d at 531.

murders occurred, but she told police "'it was just something she made up out of frustration and anger and she apologized for making the statement.'"[7] During the evidentiary hearing on Boppre's first motion for new trial, his trial counsel testified that the State did not identify M.M. as a potential witness and that Boppre did not learn of M.M.'s statement until after trial.

The district court denied Boppre's first motion for new trial, and this court affirmed in *State v. Boppre* (*Boppre II*).[8] In doing so, we concluded in part that Boppre's prosecutorial misconduct claim failed because M.M.'s statements were not material to Boppre's guilt under the standard discussed in *United States v. Agurs*.[9] We reasoned that in addition to the fact that M.M. had recanted her statement and denied that she was at the murder scene, M.M.'s testimony was not material because she did not claim to see anything directly relevant to the killings and thus "never was in a position to claim that [Boppre] was not present at the scene or that he was not the one who shot the victims."[10] We thus concluded that even if M.M.'s testimony had been offered at trial, "it would not create a reasonable doubt as to [Boppre's] guilt which did not otherwise exist."[11]

### (b) Postconviction Motions in 1995 and 2002

In August 1995, Boppre filed his first postconviction motion, claiming his trial counsel was ineffective for, among other things, failing to develop the theory that Kenard Wasmer

---

[7] *Id*. at 915, 503 N.W.2d at 531.

[8] *Boppre II, supra* note 5.

[9] *United States v. Agurs*, 427 U.S. 97, 96 S. Ct. 2392, 49 L. Ed. 2d 342 (1976).

[10] *Boppre II, supra* note 5, 243 Neb. at 927-28, 503 N.W.2d at 538.

[11] *Id*. at 928, 503 N.W.2d at 538.

committed the murders. The district court denied that motion without an evidentiary hearing, and we affirmed.[12]

In 2002, Boppre filed his second postconviction motion, claiming prosecutors withheld exculpatory evidence. The district court denied this postconviction motion, and we summarily affirmed without issuing a written opinion.[13]

### (c) DNA Testing, Second Motion for New Trial, and Third Motion for Postconviction Relief

In May 2005, Boppre filed a motion pursuant to the DNA Testing Act[14] that prompted DNA testing of various items from the crime scene, including a bloodstain found near the kitchen door handle in Valdez' home. Based on the results of those DNA tests, Boppre moved to vacate and set aside his convictions.[15] He also filed a second motion for new trial, asserting there was newly discovered DNA evidence.

In 2008, Boppre filed a third motion for postconviction relief that included a claim that his constitutional due process rights were violated when prosecutors withheld exculpatory evidence regarding M.M.'s statements about what she heard at the murder scene. This postconviction motion referenced a "recently obtained sworn statement" from M.M. in which she claimed she was hiding in the bedroom at the time of the murders and heard John Yellowboy's voice, but not Boppre's.

The district court denied Boppre's third postconviction motion without an evidentiary hearing, but it held evidentiary hearings on the 2005 motions to vacate and for new trial based on the DNA test results. It ultimately denied both

---

[12] *State v. Boppre*, 252 Neb. 935, 567 N.W.2d 149 (1997), *disapproved on other grounds, State v. Silvers*, 255 Neb. 702, 587 N.W.2d 325 (1998).

[13] See *State v. Boppre*, 267 Neb. xxi (No. S-03-541, Dec. 30, 2003).

[14] See Neb. Rev. Stat. §§ 29-4116 to 29-4125 (Reissue 2016).

[15] See § 29-4123.

motions, finding that even though testing of the bloodstain showed genetic markers consistent with the DNA profile of Yellowboy, such evidence was not exculpatory for Boppre because Yellowboy was known to be a frequent visitor to the Valdez home.

Boppre appealed the denial of his motion for new trial and the denial of his motion for postconviction relief. We affirmed both rulings in *State v. Boppre* (*Boppre V*).[16] We agreed that the DNA test results were not exculpatory for Boppre and did not support a new trial. And we found no error in dismissing the third postconviction motion based on M.M.'s statements, reasoning that they were not "favorable evidence that was material to Boppre's guilt, as required to show a violation of due process."[17] We also noted the allegations regarding M.M. had been the subject of previous unsuccessful collateral attacks and that our prior "dispositions show these claims, on the merits, do not amount to a violation of Boppre's constitutional right to due process."[18]

### (d) 2012 Postconviction Motion

In August 2012, Boppre filed a fourth motion for postconviction relief, which the district court denied without conducting an evidentiary hearing. We summarily affirmed that denial.[19]

### 2. Current Motion for New Trial

In December 2018, Boppre filed his third motion for new trial, which is the subject of this appeal. Boppre's counsel amended the motion in October 2019, but had difficulty electronically filing the amended motion and supporting

[16] *State v. Boppre*, 280 Neb. 774, 790 N.W.2d 417 (2010).

[17] *Id*. at 785, 790 N.W.2d at 426.

[18] *Id*.

[19] *State v. Boppre*, 286 Neb. xxi (No. S-12-1170, July 10, 2013).

documents, apparently due to the extraordinary length of the filing and the inclusion of multiple embedded images and videos. After unsuccessful attempts to address the issue with amended and supplemental filings in both paper and electronic format, Boppre's counsel filed what he titled a "Motion to Correct Record and for Electronic Filing of Actual Submitted Documents." That motion was taken up during a records hearing conducted at the court's request, which we describe next.

### (a) Records Hearing

In December 2019, the court conducted a records hearing on Boppre's third motion for new trial and, speaking from the bench, explained why it was using the procedure:

> I will just state that in correspondence with counsel I've asked for participation in this hearing because of the large volume of this case. It's been on file for 30-plus years. There are several volumes of exhibits and pleadings, and the voluminous nature of the file itself along with the voluminous nature of your pleadings leaves me in a position of reviewing an astronomical amount of information. And so that's the reason . . . so that I can make an initial ruling as to whether or not an evidentiary hearing should go forward.

During the records hearing, both parties offered exhibits, all of which were received. One exhibit was described by Boppre's counsel as a "complete" version of the amended motion for new trial, which was 153 pages long. Another exhibit, which was nearly 1,000 pages long and included sealed envelopes with additional documents and a flash drive, was represented to include all the supporting documents Boppre tried unsuccessfully to electronically file with the amended motion. During the records hearing, the court also received certified copies of pertinent portions of the record in Boppre's criminal case.

At the conclusion of the records hearing, Boppre asked the court to rule on his motion to correct the record. The court determined that issue was moot, reasoning that Boppre had already offered, and the court had received, the exhibits Boppre described as correct and complete copies of his amended motion for new trial and all supporting documents. From that point forward, the parties and the court treated those exhibits as the operative third motion for new trial and the documents Boppre intended to support that motion. We do likewise.

### (b) Court's Order of Dismissal and Denial of Motion to Alter or Amend

On March 31, 2021, the district court entered an order ruling on Boppre's third motion for new trial. The order identified 10 categories of newly discovered evidence asserted in the operative motion and analyzed them all, ultimately concluding that Boppre was not entitled to an evidentiary hearing on any of his claims. The court thus dismissed the third motion for new trial without an evidentiary hearing.[20]

Boppre filed a timely motion to alter or amend, asserting that the dismissal was improper and that he was entitled to an evidentiary hearing under § 29-2102(2). In support, Boppre offered three new exhibits that the court received over the State's objection. After taking the matter under advisement, the court entered an order overruling Boppre's motion to alter or amend and expressly finding that the new exhibits did not change its conclusion that an evidentiary hearing was not required on Boppre's third motion for new trial. Boppre filed this timely appeal.

### II. ASSIGNMENT OF ERROR

Boppre assigns several errors that we consolidate and restate as one: The district court erred in dismissing his

---

[20] See Neb. Rev. Stat. § 29-2102(2) (Reissue 2016).

operative motion for new trial without conducting an evidentiary hearing. In support of this assignment, Boppre generally argues that the claims of newly discovered evidence asserted in his operative motion for new trial, and the supporting documents relating to those claims, satisfied the hearing requirements set out in § 29-2102(2).

## III. STANDARD OF REVIEW

[1] An appellate court applies a de novo standard when reviewing a trial court's dismissal of a motion for new trial without conducting an evidentiary hearing, but it applies an abuse of discretion standard of review to appeals from motions for new trial denied after an evidentiary hearing.[21] Which of these standards to apply in this appeal depends on how the records hearing is characterized. We conclude the de novo standard of review is appropriate because, as we will explain, the records hearing was not an evidentiary hearing on the motion for new trial, but, rather, was a prehearing procedure designed to assist the district court in determining whether an evidentiary hearing was required.

This court has not directly addressed the propriety of holding a records hearing when considering whether to grant an evidentiary hearing on a motion for new trial under § 29-2102(2).[22] But in the postconviction context, we have long recognized that trial courts have discretion to adopt reasonable procedures for identifying which records to review when determining whether to grant a full evidentiary hearing.[23] And we have said that reasonable procedures can include holding a records hearing during which the court "receiv[es] into evidence the relevant files and records that the court

---

[21] See *State v. Cross*, 297 Neb. 154, 900 N.W.2d 1 (2017). See, also, *State v. Hill*, 308 Neb. 511, 955 N.W.2d 303 (2021).

[22] But see *Hill, supra* note 21 (Stacy, J., concurring).

[23] See, e.g., *State v. Torres*, 300 Neb. 694, 915 N.W.2d 596 (2018).

may need to review in considering whether to grant or deny an evidentiary hearing."[24]

[2] The statute governing evidentiary hearings under the Nebraska Postconviction Act is similar to the statute governing evidentiary hearings on motions for new trial, in that both require the court to make a preliminary examination and determine whether an evidentiary hearing on the motion is required.[25] We now expressly hold that when deciding whether an evidentiary hearing is required on a motion for new trial, trial courts have discretion to adopt reasonable prehearing procedures, just as they do under the Nebraska Postconviction Act. However, as we have emphasized in the postconviction context, the scope of what a court may receive at a records hearing must comport with the procedure mandated by the governing statutory scheme.[26]

Here, in response to Boppre's contention that the amended motion and supporting documents accepted for electronic filing were incomplete and inaccurate, the district court used the records hearing to receive a complete and accurate copy of the operative motion and supporting documents. The records hearing was also used to provide the court with portions of the existing court record pertinent to considering whether Boppre's third motion for new trial was timely under Neb. Rev. Stat. § 29-2103 (Reissue 2016) and satisfied the statutory requirements for an evidentiary hearing under § 29-2102(2). As utilized by the district court, the records hearing was a reasonable prehearing procedure on Boppre's third motion for new trial.

---

[24] *State v. Glover*, 276 Neb. 622, 628, 756 N.W.2d 157, 162 (2008).

[25] See *Cross, supra* note 21, 297 Neb. at 161, 900 N.W.2d at 6 (comparing evidentiary hearing provisions in § 29-2102(2) and Neb. Rev. Stat. § 29-3001(2) (Reissue 2016) and noting "the legislative history of § 29-2102(2) suggests the Legislature intended the new prehearing review process applicable to motions for new trial to be similar to the prehearing review process applied in postconviction actions").

[26] See *Glover, supra* note 24.

## IV. ANALYSIS

### 1. Overview of Motions for New Trial Based on Newly Discovered Evidence

In criminal cases, motions for new trial are governed by the provisions in Neb. Rev. Stat. §§ 29-2101 to 29-2103 (Reissue 2016). Section 29-2101 sets out seven grounds on which such a motion may be based. Boppre's operative motion for new trial relies exclusively on § 29-2101(5). Section 29-2101 provides, in relevant part:

> A new trial, after a verdict of conviction, may be granted, on the application of the defendant, for any of the following grounds affecting materially his or her substantial rights: . . . (5) newly discovered evidence material for the defendant which he or she could not with reasonable diligence have discovered and produced at the trial . . . .

[3] We have interpreted § 29-2101(5) to authorize a new trial when the defendant satisfies a two-prong burden of proof.[27] First, the defendant must show the evidence at issue has been newly discovered since trial, meaning the evidence existed at the time of trial but could not, with reasonable diligence, have been discovered and produced at trial.[28] Second, the defendant must show the evidence materially affected his or her substantial rights, meaning it is so substantial that with it, a different verdict would probably have been reached at trial.[29] Such evidence must be competent, material, and

---

[27] See *State v. Brown*, 310 Neb. 318, 965 N.W.2d 388 (2021).

[28] See *id.*

[29] See, *id.*; *State v. Krannawitter*, 305 Neb. 66, 939 N.W.2d 335 (2020). Accord, *State v. Kofoed*, 283 Neb. 767, 798, 817 N.W.2d 225, 248 (2012) (criminal defendants seeking new trial on ground of newly discovered evidence "must show that if the evidence had been admitted at the former trial, it would probably have produced a substantially different result"); *State v. Dunster*, 270 Neb. 773, 707 N.W.2d 412 (2005) (same); *State v. Faust*, 269 Neb. 749, 696 N.W.2d 420 (2005) (same).

credible, and not merely cumulative. And it must involve something other than the credibility of witnesses who testified at the former trial.[30]

But the issue raised in this appeal is not whether Boppre is entitled to the relief of a new trial; rather, it is whether Boppre's motion for new trial and supporting documents entitled him to an evidentiary hearing. We thus begin by reviewing the various statutory requirements that must be satisfied to avoid dismissal of a motion for new trial without an evidentiary hearing.

#### (a) Form and Content Requirements

Section 29-2103 requires all motions for new trial to be "made by written application"[31] and to "state the grounds under section 29-2101 which are the basis for the motion."[32] Additionally, all new trial motions must "be supported by evidence as provided in section 29-2102."[33]

[4] Section 29-2102(1) sets out the type of evidence that will support a motion for new trial based on newly discovered evidence under § 29-2101(5), and it provides that such a motion "shall be supported by evidence of the truth of the ground in the form of affidavits, depositions, or oral testimony." If a motion under § 29-2101(5) is not supported by the required evidence in the required form, a district court need not consider it further and may deny the motion without an evidentiary hearing.[34] We elaborate further on this supporting document requirement later in our analysis.

---

[30] *State v. French*, 200 Neb. 137, 262 N.W.2d 711 (1978).

[31] § 29-2103(1).

[32] § 29-2103(2).

[33] *Id*.

[34] See, *Hill, supra* note 21 (affirming dismissal of motion for new trial based on newly discovered evidence because defendant's motion did not include required supporting documents in form of affidavits, depositions, or oral testimony); *Cross, supra* note 21 (holding handwritten letter attached to motion for new trial based on newly discovered evidence was not type of supporting evidence permitted by § 29-2102(1)).

### (b) Timeliness Requirements

[5] To have any effect, a motion for new trial must comply with the statutory time limitations.[35] Section 29-2103 imposes different time limits on filing motions for new trial, depending on the statutory ground relied upon. We limit our discussion here to motions based upon the ground of newly discovered evidence.

Prior to August 30, 2015, a motion based on newly discovered evidence had to be "filed within a reasonable time after the discovery of the new evidence and [could not] be filed more than three years after the date of the verdict."[36] But in 2015,[37] the Legislature amended the new trial statutes, including the timeliness requirements in § 29-2103. Currently, a motion for new trial alleging newly discovered evidence

shall be filed within a reasonable time after the discovery of the new evidence and cannot be filed more than five years after the date of the verdict, unless the motion and supporting documents show the new evidence could not with reasonable diligence have been discovered and produced at trial and such evidence is so substantial that a different result may have occurred.[38]

The 2015 amendments thus retained the statutory requirement that motions for new trial based on newly discovered evidence must be filed "within a reasonable time after the discovery of the new evidence," but repealed the 3-year time bar and replaced it with a qualified 5-year time bar.[39] Our prior opinions have not discussed how to construe the qualified 5-year time bar, and we do not discuss it in this opinion either.

---

[35] See *State v. Bartel*, 308 Neb. 169, 953 N.W.2d 224 (2021).

[36] See § 29-2103(4) (Reissue 2008).

[37] 2015 Neb. Laws, L.B. 245.

[38] § 29-2103(4) (Reissue 2016).

[39] See 2015 Neb. Laws, L.B. 245.

Instead, our timeliness inquiry will focus on the statutory requirement that the motion "shall be filed within a reasonable time after the discovery of the new evidence."[40]

[6] If a motion for new trial fails to satisfy the statutory timeliness requirements imposed by the Legislature, a court need not consider it further and may dismiss it without an evidentiary hearing.[41]

### (c) Statutory Standard for Evidentiary Hearing

Evidentiary hearings have long been used by trial courts when considering motions for new trial, but the Legislature's 2015 amendments to the new trial statutes added specific provisions governing evidentiary hearings.[42] Section 29-2102(2) currently provides:

> If the motion for new trial and supporting documents fail to set forth sufficient facts, the court may, on its own motion, dismiss the motion without a hearing. If the motion for new trial and supporting documents set forth facts which, if true, would materially affect the substantial rights of the defendant, the court shall cause notice of the motion to be served on the prosecuting attorney, grant a hearing on the motion, and determine the issues and make findings of fact and conclusions of law with respect thereto.

The hearing provisions in § 29-2102(2) apply regardless of the statutory ground on which a new trial is sought, but in *State v. Hill*,[43] we considered how those provisions apply to a

---

[40] § 29-2103(4).

[41] See, *Bartel, supra* note 35 (refusing to consider motion for new trial to extent grounds failed to conform to statutory timeliness requirements); *Cross, supra* note 21.

[42] See 2015 Neb. Laws, L.B. 245.

[43] See *Hill, supra* note 21.

motion for new trial asserting the ground of newly discovered evidence. *Hill* explained that when a motion for new trial is based on newly discovered evidence, a court may dismiss the motion without an evidentiary hearing if the motion and supporting documents "did not set forth sufficient facts to establish that there was newly discovered evidence, that such evidence was material to [the] defense, and that [the defendant] could not with reasonable diligence have discovered and produced the evidence at . . . trial."[44]

*Hill* did not directly address what it means under § 29-2102(2) to "set forth facts which, if true, would materially affect the substantial rights of the defendant." We note that nearly identical materiality language appears in § 29-2101, which provides that a new trial may be granted for "grounds affecting materially [the defendant's] substantial rights." And in the context of motions for new trial based on newly discovered evidence, we have long construed the materiality provision in § 29-2101 to require that a defendant must show the evidence is so substantial that with it, a different verdict would probably have been reached at trial.[45]

[7,8] When the Legislature amended § 29-2102(2) in 2015 to add evidentiary hearing requirements, it used materiality language that is nearly identical to that used in § 29-2101. It is a settled principle of statutory construction that components of a series or collection of statutes pertaining to a certain subject matter are in pari materia and should be conjunctively considered and construed to determine the intent of the Legislature so that different provisions are consistent, harmonious, and sensible.[46] Because the materiality provisions in

---

[44] *Id*. at 520, 955 N.W.2d at 309.

[45] See, *Brown, supra* note 27; *Krannawitter, supra* note 29. Accord, *Kofoed, supra* note 29; *Dunster, supra* note 29; *Faust, supra* note 29.

[46] *State v. Roth*, 311 Neb. 1007, 977 N.W.2d 221 (2022).

§§ 29-2101 and 29-2102(2) use nearly identical language, we construe them consistently.[47]

[9] As such, building on our proposition from *Hill*, we now hold that when a defendant seeks a new trial on the ground of newly discovered evidence, the evidentiary hearing provisions of § 29-2102(2) are satisfied if the motion and supporting affidavits, depositions, or oral testimony set forth sufficient facts which, if true, establish that (1) the new evidence existed at the time of trial but could not, with reasonable diligence, have been discovered and produced at trial and (2) such evidence is so substantial that with it, a different verdict would probably have been reached at trial.

(d) Summary of Analytical Framework

[10] In summary, to properly analyze whether a defendant is entitled to an evidentiary hearing on claims of newly discovered evidence, a court considers, with respect to each claim, whether the motion and supporting documents (1) comport with the form and content requirements of §§ 29-2102 and 29-2103; (2) comport with the timeliness requirements of § 29-2103; and (3) set forth facts which, if true, satisfy the evidentiary hearing requirements of § 29-2102(2). Because a defendant must satisfy all of these requirements to be entitled to an evidentiary hearing, a court may address the requirements in any order and the defendant's failure to satisfy one requirement makes it unnecessary for the court to address the others.

Before analyzing whether Boppre's motion and supporting documents satisfy all these requirements, there are several preliminary matters to address. In the sections that follow, we

---

[47] See, *In re Estate of Psota*, 297 Neb. 570, 900 N.W.2d 790 (2017) (in enacting statute, Legislature is presumed to have knowledge of all previous legislation on subject); *Heckman v. Marchio*, 296 Neb. 458, 894 N.W.2d 296 (2017) (where statute has been judicially construed and construction has not evoked amendment, it is presumed Legislature acquiesced in court's determination of its intent).

(1) identify what Boppre is claiming to be newly discovered evidence, (2) identify which of Boppre's supporting documents are properly considered, (3) address the unusual procedural posture of this case, and (4) address the applicability of the law-of-the-case doctrine.

## 2. Preliminary Matters

### (a) Identifying Boppre's Claims of Newly Discovered Evidence

As the district court noted, the manner in which Boppre has styled his operative motion for new trial makes it exceptionally challenging to identify what, specifically, he asserts is the newly discovered evidence that supports his third motion for new trial. Instead of facilitating the preliminary judicial review required by §§ 29-2101 to 29-2103, Boppre's operative motion and supporting documents unnecessarily frustrated it.

Boppre's operative motion reads more like a true crime mystery than a concise legal motion. It is 153 pages long, includes more than 60 images and video links, and buries factual assertions within long historical narratives that are scattered with legal conclusions. We discern no meaningful effort to tie any of the allegations to the statutory requirements for an evidentiary hearing set out in § 29-2102(2), or to the timeliness requirements set out in § 29-2103(4).

[11] We are seeing similarly drafted motions with more regularity in cases such as this, and we expressly disapprove of the practice. It makes the trial court's preliminary review process unnecessarily cumbersome and increases the risk that even a careful review of a novel-length motion might fail to identify a critical fact or supporting document. Although the rules of civil pleading do not govern motions such as this,[48] that does not mean that courts must tolerate motions for

---

[48] See *State v. Robertson*, 294 Neb. 29, 881 N.W.2d 864 (2016) (holding that motions in postconviction proceedings are not governed by Nebraska Court Rules of Pleading in Civil Cases).

new trial that are not clear and succinct. It is not the court's duty to scour the record in search of facts that might support a claim.[49]

[12] In a postconviction motion, when stating the "grounds relied upon"[50] for postconviction relief, we require defendants to "make specific allegations instead of mere conclusions of fact or law in order to receive an evidentiary hearing."[51] We now recognize a similar pleading requirement for defendants filing a motion for new trial: Such motions must make specific allegations, instead of mere conclusions of fact or law, to receive an evidentiary hearing. Indeed, the statutes governing motions for new trial are perhaps even more specific in this regard than the statutes governing postconviction motions, because § 29-2102(2) requires motions for new trial to "set forth sufficient facts" and provides that if a motion fails to do so, "the court may, on its own motion, dismiss the motion without a hearing."

[13] To assist both litigants and trial courts, we clarify that in order to "set forth sufficient facts" under § 29-2102(2), a motion for new trial based on newly discovered evidence should clearly and succinctly identify the evidence claimed to be newly discovered and should state with particularity (1) the date on which such evidence was discovered; (2) why such evidence could not, with reasonable diligence, have been discovered and produced at trial; and (3) why such evidence is so substantial that with it, a different verdict would probably have been reached at trial.

---

[49] See *In re App. No. C-4973 of Skrdlant*, 305 Neb. 635, 942 N.W.2d 196 (2020). Accord, *State v. Jennings*, 312 Neb. 1020, 1026, 982 N.W.2d 216, 223 (2022) (courts "will not scour the record on appeal to understand unclear arguments or find support for broad conclusions"); *State v. Wood*, 310 Neb. 391, 427, 966 N.W.2d 825, 853 (2021) (recognizing courts "do not scour the record in search of facts that might support an appellant's claim").

[50] § 29-3001(1).

[51] *Boppre V, supra* note 16, 280 Neb. at 784, 790 N.W.2d at 425.

Boppre's operative motion was far from clear and succinct, but with the assistance of written briefs, the district court was able to discern that Boppre was asserting 10 categories of newly discovered evidence. On appeal, Boppre acknowledges that the "trial court divided Boppre's newly discovered evidence into ten categories,"[52] and he does not assign or argue that the court erred by misidentifying, mischaracterizing, or overlooking any category of newly discovered evidence alleged in his operative motion. We therefore use the same 10 categories of evidence as the starting point for our appellate review. But we do not ultimately address all 10 categories of evidence, because we conclude only four of the categories were sufficiently argued in Boppre's appellate brief.

[14,15] To be considered by an appellate court, an alleged error must be both specifically assigned and specifically argued.[53] Conclusory assertions unsupported by coherent analytical argument fail to satisfy the requirement of arguing an assigned error to obtain consideration by an appellate court.[54] Although Boppre's brief makes conclusory statements about several categories of newly discovered evidence considered by the district court, he does not support those statements with coherent legal analysis. Several other categories of evidence are referenced only in a summary chart appearing at the end of Boppre's brief, again with no legal analysis. Because this does not satisfy the rule that assigned errors must be specifically argued, our de novo review will consider only those categories of newly discovered evidence that were considered by the district court and that Boppre specifically assigned and specifically argued in his appellate brief. We describe those four categories broadly now and provide greater detail later in our analysis.

---

[52] Brief for appellant at 20.

[53] See, *State v. Miranda*, 313 Neb. 358, 984 N.W.2d 261 (2023); *Humphrey v. Smith*, 311 Neb. 632, 974 N.W.2d 293 (2022).

[54] *State v. Trail*, 312 Neb. 843, 981 N.W.2d 269 (2022).

Broadly stated, our de novo review will address the following four categories of evidence: (1) evidence supporting the theory that Yellowboy was responsible for murdering Valdez and Condon, (2) evidence suggesting the gun recovered in New Mexico was not the murder weapon, (3) evidence undermining the State's theories at trial, and (4) evidence that Boppre's trial counsel had a conflict of interest.

### (b) Proper Supporting Documents

[16] As stated, § 29-2102(1) directs that motions for new trial asserting newly discovered evidence "shall be supported by evidence of the truth of the ground in the form of affidavits, depositions, or oral testimony." We have construed this statutory requirement to mandate such supporting documents and to allow dismissal without an evidentiary hearing when no such supporting documents are presented.[55] And we have emphasized that "[t]he requirement for evidence of the truth of the asserted grounds is not trivial; it is designed, inter alia, to demonstrate the strength of the claim, which in turn determines entitlement to a hearing."[56] Thus, even when the allegations in the motion itself set forth a narrative to support a new trial based on newly discovered evidence, the failure to accompany the motion with the type of supporting evidence required by § 29-2102(1) provides a basis for dismissal without an evidentiary hearing.[57]

At the records hearing in this case, the court received more than 1,000 pages of supporting documents comprising various affidavits, as well as stand-alone photographs, letters, newspaper articles, magazine articles, police reports, pleadings, orders, and a variety of other documents. But only affidavits, depositions, and oral testimony are competent supporting documents under the plain language of § 29-2102(1). We

---

[55] See *Hill, supra* note 21.

[56] *Id.* at 521, 955 N.W.2d at 309.

[57] *Hill, supra* note 21.

therefore limit our de novo review of Boppre's supporting documents to those authorized by § 29-2102(1), which in this case include only the affidavits received during the records hearing. We neither consider nor discuss the other documents received at the records hearing.

[17] Nor do we consider any of the exhibits that Boppre offered during the hearing on his motion to alter or amend. At the point when Boppre offered such exhibits, the court had already conducted its review of the operative motion and supporting documents, had determined they did not warrant an evidentiary hearing, and had entered an order dismissing the motion. While nothing in the statutes authorizing motions for new trials in criminal cases expressly precludes a party from asking the court to alter or amend its ruling dismissing such a motion, neither do the statutes authorize expanding the supporting documents *after* the court has entered a final order denying the motion.[58] Simply put, we do not read the new trial statutes to permit a defendant to supplement the required supporting documents after receiving an order dismissing the motion without an evidentiary hearing. Consequently, our de novo review will consider only those supporting documents that were received during the records review hearing and that also comport with § 29-2102(1).

### (c) Unique Procedural Posture

When considering whether Boppre's third motion for new trial was filed within a reasonable time after the discovery of the evidence he relies upon, we do not ignore the unique procedural circumstances presented by the 2015 amendments to § 29-2103(4). Before such amendments, a motion for new trial based on newly discovered evidence could not be filed more than 3 years after the date of the verdict.[59] Boppre's

---

[58] Accord *Robertson, supra* note 48 (holding Nebraska Postconviction Act does not contemplate opportunity to amend motion after court determines it is not sufficient to necessitate evidentiary hearing).

[59] See 2015 Neb. Laws, L.B. 245.

verdicts occurred in 1989, so after he filed his first motion for new trial in 1992, Boppre was effectively time barred from filing a motion for new trial based on newly discovered evidence under § 29-2101(5) until the effective date of the amendments to § 29-2103(4) on August 30, 2015. While not determinative, this procedural posture is one of the circumstances we consider when evaluating the timeliness of the claims asserted in his December 2018 motion.

### (d) Law-of-the-Case Doctrine

The State's brief on appeal argues that several of Boppre's claims of newly discovered evidence are barred by the law-of-the-case doctrine, because substantially similar claims have already been considered and rejected by an appellate court. We have not previously discussed the applicability of this doctrine in the context of motions for new trial based on newly discovered evidence.

[18-20] Unlike the doctrines of claim and issue preclusion, which involve successive lawsuits, the law-of-the-case doctrine involves successive stages of one continuing lawsuit.[60] When it applies, the law-of-the-case doctrine operates to preclude reconsideration of substantially similar, if not identical, issues at successive stages of the same suit or prosecution.[61] The doctrine promotes judicial efficiency and protects parties' settled expectations by preventing parties from relitigating settled issues within a single action.[62]

[21,22] Under the law-of-the-case doctrine, the holdings of an appellate court on questions presented to it in reviewing proceedings of the trial court become the law of the case; those holdings conclusively settle, for purposes of that litigation, all matters ruled upon, either expressly or by necessary

---

[60] *Money v. Tyrrell Flowers*, 275 Neb. 602, 748 N.W.2d 49 (2008).

[61] *State v. Price*, 306 Neb. 38, 944 N.W.2d 279 (2020); *State v. Lavalleur*, 298 Neb. 237, 903 N.W.2d 464 (2017).

[62] *Spratt v. Crete Carrier Corp.*, 311 Neb. 262, 971 N.W.2d 335 (2022).

implication.[63] The doctrine is not without exceptions, however. Courts will not apply the law-of-the-case doctrine "if considerations of substantial justice suggest a reexamination of the issue is warranted,"[64] if materially and substantially different facts are presented,[65] or if the applicable law has changed.[66]

[23] This court has applied the law-of-the-case doctrine in criminal cases,[67] in postconviction cases,[68] and in motions for new trial based on DNA testing.[69] We see no principled reason the doctrine cannot also be applied in motions for new trial when the defendant asserts that evidence is newly discovered, but the files and records in the case show that the same or substantially similar evidence has already been considered by an appellate court in the same case and found not to support a new trial.[70] However, just as in other case types, the doctrine

---

[63] *Price, supra* note 61; *Lavalleur, supra* note 61.

[64] *Price, supra* note 61, 306 Neb. at 52, 944 N.W.2d at 291. Accord, *Money, supra* note 60 (law-of-case doctrine will not apply when considerations of substantial justice suggest reexamination of issue is warranted, when materially and substantially different facts are presented, or when applicable law has changed); *State v. Davlin*, 272 Neb. 139, 719 N.W.2d 243 (2006) (law-of-case doctrine will not preclude reconsideration of foundational challenge to expert's testimony in second trial, where expert's opinions varied from one trial to next and new legal standard for admissibility was adopted after first trial).

[65] See, *Price, supra* note 61; *Lavalleur, supra* note 61; *Money, supra* note 60.

[66] See, *Money, supra* note 60; *Davlin, supra* note 64.

[67] See, e.g., *Price, supra* note 61; *Lavalleur, supra* note 61; *State v. Merchant*, 288 Neb. 439, 848 N.W.2d 630 (2014); *Davlin, supra* note 64.

[68] See, e.g., *Thomas v. State*, 268 Neb. 594, 685 N.W.2d 66 (2004) (holding law-of-case doctrine precluded reconsideration of alleged juror misconduct in connection with postconviction claim because appellate court had previously affirmed denial of motion for new trial based on claims of juror misconduct).

[69] See, e.g., *State v. Pratt*, 277 Neb. 887, 766 N.W.2d 111 (2009) (holding law-of-case doctrine did not preclude trial court from reconsidering matter not reached in prior appeal that was dismissed for lack of jurisdiction).

[70] See, *Price, supra* note 61; *Lavalleur, supra* note 61.

should not be applied if the defendant presents materially and substantially different facts,[71] when the applicable law has changed,[72] or when considerations of substantial justice suggest a reexamination of the issue is warranted.[73]

### 3. Analysis of Boppre's Motion and Supporting Documents

Having reviewed the analytical framework and addressed the preliminary matters bearing on our de novo review, we turn now to consideration of whether Boppre was entitled to an evidentiary hearing on any of the four broad categories of newly discovered evidence that he asserted in his operative motion for new trial and specifically assigned and argued in his appellate brief. For the convenience of the reader, we repeat the most pertinent standards that govern judicial review of a motion for new trial asserting the ground of newly discovered evidence.

The statutory form and content requirements are met when the motion is "supported by evidence of the truth of the ground in the form of affidavits, depositions, or oral testimony."[74] The statutory time requirement in § 29-2103(4) is met when the motion is filed within a reasonable time after the discovery of the new evidence. And an evidentiary hearing is required by § 29-2102(2) when the motion and supporting documents set forth sufficient facts which, if true, establish that (1) the evidence relied upon existed at the time of trial but could not, with reasonable diligence, have been discovered and produced at trial and (2) such evidence is so substantial that with it, a different verdict would probably have been reached at trial.

---

[71] *Id.*

[72] See *Money, supra* note 60.

[73] See *Price, supra* note 61. Accord *Davlin, supra* note 64.

[74] § 29-2102(1).

### (a) Evidence Implicating Yellowboy

Boppre's operative motion and appellate briefing describe three subcategories of newly discovered evidence implicating Yellowboy as the person who murdered Valdez and Condon: (1) evidence that Yellowboy's DNA was discovered at the crime scene, (2) evidence that M.M. heard Yellowboy's voice on the night of the murders, and (3) evidence that Yellowboy made statements about committing the murders. In the sections that follow, we summarize each of these subcategories of evidence and the supporting documents that Boppre offered to show the truth of such evidence. We then analyze whether Boppre's motion and supporting documents satisfied all the requirements for an evidentiary hearing regarding such evidence.

### (i) Evidence of Yellowboy's DNA

Boppre's motion alleges that "previously ordered" DNA testing identified Yellowboy as the source of a bloodstain found beside a door handle in Valdez' home. He asserts this evidence is material because "[t]here is no innocent explanation for Yellowboy's blood stains [on] the door of the farmhouse." We identify just one supporting document referencing this evidence—an affidavit from a medical doctor opining that there may have been more than one assailant involved in Valdez' murder.

We need not analyze whether Boppre's motion and supporting documents satisfy all the requirements for an evidentiary hearing on this evidence, because we conclude the same evidence of Yellowboy's DNA has already been considered in this case and found not to support a new trial, so the claim is barred by the law-of-the-case doctrine.

In *Boppre V*, decided in 2010, we considered the same DNA test results Boppre now claims are newly discovered, and we concluded the evidence did not entitle Boppre to a new trial under the DNA Testing Act. We described the issue on appeal as "whether the [Yellowboy] DNA evidence was of

such a nature that if it had been offered and admitted at the former trial, it probably would have produced a substantially different result."[75] We concluded the DNA evidence was not exculpatory, because it did not disprove the State's theory that Boppre was the perpetrator and did not impeach Niemann's and Wasmer's testimony that Boppre was the shooter. Instead, we found the DNA evidence "merely showed that . . . Yellowboy, a frequent visitor, had been to the Valdez home at some point in time prior to the murder investigation."[76] We also noted that Boppre called Yellowboy as a witness during trial and that Yellowboy admitted he was at the Valdez home on the night of the murders and saw Boppre there. Finally, for the sake of completeness, we stated in *Boppre V* that even if the DNA evidence were considered in light of other evidence Boppre had developed after trial, "the DNA results would still not be exculpatory."[77]

The law-of-the-case doctrine plainly bars reconsideration of Boppre's claim that he is entitled to a new trial based on evidence that Yellowboy's DNA profile was found in a blood-stain near a door handle at the Valdez home. We have already considered the same evidence and concluded that it would not have produced a different result at trial, and Boppre's current motion presents no materially different facts regarding this DNA evidence; nor does he suggest that considerations of substantial justice warrant reexamination of the issue or that the applicable law has changed. The district court did not err in dismissing this claim without an evidentiary hearing.

### (ii) Evidence That M.M. Heard Yellowboy's Voice

Boppre's operative motion describes "newly discovered" evidence that M.M. was hiding under a mattress in the bedroom when the murders occurred and heard Yellowboy's

---

[75] *Boppre V, supra* note 16, 280 Neb. at 781, 790 N.W.2d at 423.

[76] *Id*. at 783, 790 N.W.2d at 424.

[77] *Id*.

voice but did not hear Boppre's voice. Boppre claims he did not know about this evidence at the time of trial. But he acknowledges that since at least 1992, he and his investigators have known that M.M. claimed to have been hiding under the mattress during the murders and said she did not hear Boppre's voice. Despite this knowledge, Boppre's operative motion alleges that M.M. did not tell her "full true" story about this evidence to Boppre's investigators until 2017. The operative motion therefore characterizes M.M.'s 2017 affidavit as "newly discovered for the purposes of this Motion."

In her 2017 affidavit, M.M. states that she and Condon were in a bedroom talking when they heard people arrive. M.M. affirmatively states that she heard Yellowboy's voice, after which Condon told her to hide, so she crawled

> between the wall and the bed and I was able to pull the mattress over me a little. I could hear people walking around and muffled conversations but I was so scared and I couldn't really understand what was going on. I could hear at least two voices but somehow I feel like there was three people there. I knew . . . Boppre's voice and I did not hear his voice that night.

To support the truth of M.M.'s claim that she was hiding inside the Valdez house at the time of the murders, Boppre refers to several other affidavits in the record, including prior affidavits signed by M.M. in 1992.

Once again, we need not analyze whether Boppre's motion and supporting documents satisfy all the requirements for an evidentiary hearing on this claim, because we conclude that reconsideration of this evidence is barred by the law-of-the-case doctrine. As our earlier recitation of the procedural background illustrates, this is not the first time Boppre has requested a new trial based on a statement by M.M. that she was hiding at the murder scene and heard Yellowboy's voice, but not Boppre's voice. We considered substantially similar evidence in both *Boppre II* and *Boppre V.*

In *Boppre II*, we considered Boppre's claim that the State engaged in prosecutorial misconduct by not disclosing M.M.'s statement.[78] We rejected that claim, concluding that M.M.'s statement was not material and would not have created reasonable doubt as to Boppre's guilt, because M.M. did not claim to see anything directly relevant to the killings and "never was in a position to claim that [Boppre] was not present at the scene or that he was not the one who shot the victims."[79] We specifically found that even if M.M.'s testimony had been offered at trial, "it would not create a reasonable doubt as to [Boppre's] guilt which did not otherwise exist."[80]

In *Boppre V*, we considered Boppre's claim that his due process rights were violated when the State failed to disclose M.M.'s statements.[81] We again concluded that M.M.'s statements were not material to Boppre's guilt, reasoning that her evidence was not "favorable evidence that was material to Boppre's guilt."[82]

Although Boppre suggests that M.M.'s 2017 affidavit is more complete than her prior affidavits, the substance of what she claims to have heard while hiding under the mattress is no different than the evidence we considered in *Boppre II* and *Boppre V*. We have already concluded this evidence does not materially affect Boppre's guilt and does not entitle him to a new trial, and Boppre does not assert, nor do we find, that the applicable law has changed[83] or that considerations of substantial justice suggest a reexamination of the issue is warranted.[84] We therefore conclude the law-of-the-case

---

[78] *Boppre II, supra* note 5.

[79] *Id.*, 243 Neb. at 927-28, 503 N.W.2d at 538.

[80] *Id.* at 928, 503 N.W.2d at 538.

[81] *Boppre V, supra* note 16.

[82] *Id.* at 785, 790 N.W.2d at 426.

[83] See *Money, supra* note 60.

[84] See *Price, supra* note 61. Accord *Davlin, supra* note 64.

doctrine bars reconsideration of this evidence as reframed in M.M.'s 2017 affidavit.

### (iii) Evidence of Yellowboy's Confession

Boppre's operative motion asserts there is newly discovered evidence that, at some point before Boppre's trial, Yellowboy told a woman named "Sheila" that he killed Valdez and Condon and threatened to do the same to Sheila. The motion generally refers to Yellowboy's statements as "confessions." Boppre's supporting documents for this claim include several affidavits, one of which was signed by Sheila on August 8, 2017.

In this affidavit, Sheila states that sometime after the murders, Yellowboy kidnapped her from a motel in Scottsbluff and drove her to the vacant home where Valdez and Condon were murdered. Sheila states that Yellowboy physically and sexually assaulted her inside the home and that during the assaults, he said "he would kill me like he killed [Condon] and that no one would find me." Sheila stated that after this, Yellowboy claimed that "he owned" her and that she "would never be able to get away." He told Sheila that if she disobeyed him, he would "find [her] and kill [her]." Sheila states that another time, Yellowboy took her to a cemetery in Scottsbluff and said they "were at [Condon's] grave." While they were there, he raped and beat Sheila and told her that "he wished he had stabbed [Condon] instead of shooting her." He also told Sheila that if she ever left him, "he would find [her] and kill [her]." Sheila's affidavit states that her fear of Yellowboy prompted her to move to another state and prevented her from coming forward sooner.

To support the truth of Sheila's evidence about Yellowboy's statements, Boppre refers to M.M.'s 1992 and 2017 affidavits, in which M.M. avers that someone named "Sheila" told her that Yellowboy confessed to killing Valdez and Condon. Boppre also refers to supporting affidavits describing Yellowboy's violent criminal history both before and after the murders of Valdez and Condon, which Boppre says "shows

[Yellowboy] to be perfectly capable of having committed the murders." Finally, Boppre refers to affidavits from his investigators describing the various investigative tools they had used since 1992 in an effort to locate and interview Sheila and explaining how, in 2017, they eventually located her living in Florida under a different surname and traveled there to obtain her affidavit.

The district court concluded that Sheila's evidence about Yellowboy's statements did not require an evidentiary hearing for several reasons: (1) The evidence was discovered decades ago (which we understand to be an implicit finding that the motion was not filed within a reasonable period of time after discovering the evidence); (2) the evidence is inadmissible hearsay; and (3) in any event, the evidence is not so substantial that with it, a different verdict would probably have been reached at trial.

Regarding Sheila's evidence, we need not analyze whether Boppre's motion and supporting documents satisfy all of the requirements for an evidentiary hearing, because we conclude Boppre's motion and supporting documents have not set forth facts which, if true, would materially affect his substantial rights.[85] In other words, this evidence is not so substantial that with it, a different verdict would probably have been reached at trial.

As the district court observed, Sheila's testimony about what Yellowboy said to her appears to be inadmissible hearsay being offered for its truth.[86] Boppre's motion has advanced no legal theory under which such statements would be admissible if offered during either an evidentiary hearing or a new trial, and it is fundamental that newly discovered evidence must be admissible before it can be evidence that is so substantial

---

[85] See § 29-2102(2).

[86] See Neb. Rev. Stat. § 27-801 (Reissue 2016) (defining hearsay as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted").

that with it, a different verdict would probably have been reached at trial.

But even if there is some theory under which Sheila's testimony about Yellowboy's statements might be deemed admissible, this evidence, even if true, is not so substantial that with it, a different verdict probably would have been reached at trial.[87] As our earlier recitation of the evidence at trial demonstrates, there was overwhelming evidence of Boppre's guilt, including eyewitness testimony identifying Boppre as the shooter, testimony from Boppre's jailmate that Boppre admitted to the murders, expert ballistics evidence connecting bullets and casings found at the murder scene to a handgun owned and used by Boppre, and a dying declaration written by one of the victims identifying Boppre by name. None of this evidence is refuted or weakened by Sheila's testimony that Yellowboy "confessed" to the killings while he was assaulting her. Moreover, the context of Yellowboy's statements strongly suggests he made the statements to terrorize and control Sheila, rather than to confess responsibility for the murders. We cannot find the district court erred in dismissing this claim without an evidentiary hearing.

### (b) Evidence Relating to
### Murder Weapon

Boppre's operative motion asserts there is newly discovered evidence that calls into question whether "major undisclosed modifications were made to the [handgun recovered in New Mexico] before it was tested" and whether the handgun found in New Mexico is "the same gun that is still in evidence and was identified as the murder weapon." As part of this claim, Boppre identifies three subcategories of evidence that he describes as newly discovered: (1) evidence regarding a missing magazine release, (2) evidence that the murder weapon was reported stolen, and (3) evidence that Niemann was in jail

---

[87] See *Krannawitter, supra* note 29.

in Nebraska on the day the handgun was recovered in New Mexico. Boppre argues this evidence "call[s] into question the entire story surrounding the discovery of the gun."[88] Before we analyze each subcategory of evidence, we provide additional detail about the ballistics evidence adduced at trial.

### (i) Ballistics Evidence

Evidence at trial established that before the murders of Valdez and Condon, Boppre owned a handgun and used it for target practice near his father's residence. After the murders, investigators recovered shell casings from the target practice area. Evidence at trial also established that after the murders, Wasmer and Niemann led law enforcement to an area in New Mexico where they located and recovered parts of the handgun allegedly used in the murders of Valdez and Condon.

The State's ballistics expert testified that the recovered handgun, a "La Industrial Orbea Eibar .32 auto. pistol," was caked in mud and debris and had "several parts . . . missing" when it was delivered to him. Using a photograph of an exemplar gun of the same make and model, the expert generally testified about which parts were missing from the recovered gun, and about the modifications required to get the recovered gun to fire so that ballistics testing could be performed. The expert did not purport to testify about every modification he made in order to get the gun to fire, but he did testify that none of the modifications would "in any way change what kind of markings would end up on a shell casing or the bullet." He also testified that if the recovered gun had been in proper working order, it would have fired nine rounds from a magazine clip, but that when he test-fired the recovered gun, he was "not using a magazine to automatically load" the rounds and instead had to "manually pull the slide back, feed another [round] into the chamber, close the slide and fire it again."

---

[88] Brief for appellant at 17.

The State's ballistics expert also testified about testing performed on both shell casings and bullets. Using a microscope, the expert examined the shell casings recovered from Boppre's target practice area and the shell casings recovered from the murder scene and concluded they came from the same gun. The expert also concluded the shell casings from bullets test-fired from the gun recovered in New Mexico matched the shell casings recovered from the murder scene.

As to the bullets, the State's expert testified that bullets recovered from the murder scene and from the victims' bodies matched the bullets test-fired from the recovered handgun. The State's ballistics evidence thus tied Boppre to the crime in two ways: (1) Shell casings from Boppre's target practice area matched casings recovered from the murder scene, and (2) casings and bullets from test-firing the recovered handgun matched casings and bullets recovered from the murder scene and the victims.

Boppre also offered trial testimony from his own ballistics expert, who also performed ballistics testing on the handgun recovered from New Mexico. Boppre's expert testified that the condition of the gun made it dangerous to test-fire because "[a]ll of the normal component parts were not present," but that after 63 tries, he was able to get the gun to fire. Boppre's expert did not explain what he had to do to get the gun to fire or which specific component parts were missing, but he did not dispute the State's expert's explanation on those issues. As to the shell casings, Boppre's expert agreed that the casings from test-firing the recovered gun matched both the casings found at the murder scene and those found in Boppre's target practice area. As to the bullets, Boppre's expert acknowledged the bullets fired from the recovered gun were similar to bullets recovered from the crime scene and the victims, but he could not say for certain they were fired from the same gun, in part because the recovered gun had significant oxidation on its barrel, perhaps from being immersed in water.

With this additional background regarding the ballistics evidence in mind, we now address Boppre's specific claims of newly discovered evidence regarding the handgun.

### (ii) Evidence of Missing
### Magazine Release

Boppre alleges that in March 2019, his investigators obtained negatives of field photographs taken of the mud-caked gun when it was recovered in New Mexico that were "never before available to Boppre." He claims these negatives were then scanned to make "high-resolution" images, and he alleges that "[t]he clarity and definition" of the enhanced images constitute "'newly discovered'" evidence that allows "a completely new ability to compare the gun 'found' and photographed in the mud in New Mexico with the gun still in evidence." According to Boppre, when these images are compared, a magazine release is visible on the image of the gun still in evidence, but no magazine release is visible in the high-definition image of the mud-caked gun photographed in New Mexico. The State disputes this conclusion, arguing that the recovered gun has always had a magazine release but the field photographs did not capture that detail because the gun was covered in mud. At this phase, however, we consider only whether Boppre's motion and supporting documents have set forth facts which, "if true,"[89] would materially affect his substantial rights. As framed by Boppre's motion, the newly discovered evidence is high-resolution images showing that the gun "found in the mud did not contain a magazine release," and we focus our analysis accordingly.

The supporting document for this claim is an affidavit from a firearm expert Boppre retained in August 2019. That affidavit states that in a "Spanish 'Ruby' type pistol," the "magazine release holds the magazine of bullets and main spring inside of the gun," and that "without the magazine release, the gun

---

[89] See § 29-2102(2).

would be inoperable and could not have been tested." The affidavit refers to high-resolution images of the gun "found in the mud [and] photographed by law enforcement in 1988" and concludes the mud-covered gun "does not contain a magazine release." Based on this conclusion, the expert opines that either the gun tested by the ballistics experts and admitted into evidence at trial was not the same gun recovered in New Mexico or, if it was, it was modified to include a magazine release even though the State's expert did not mention such a modification in his testimony.

The State argues that the high-resolution images should not be considered newly discovered evidence. Alternatively, the State argues that even if evidence about a missing magazine release is newly discovered, it is not material, because "whether [the State's ballistics expert] or someone else added a magazine release had no impact on the ballistics [evidence]."[90]

We express no opinion about whether the images Boppre relies upon can properly be considered newly discovered evidence.[91] Nor is it necessary to analyze whether Boppre's motion and supporting documents regarding the missing magazine release satisfy all the requirements for an evidentiary hearing—because, as we explain, this evidence, even if true, would not materially affect Boppre's substantial rights and thus does not entitle him to an evidentiary hearing under § 29-2102(2).

Boppre does not dispute that both ballistics experts performed testing on the gun that was admitted into evidence,

---

[90] Brief for appellee at 44.

[91] See, e.g., *U.S. v. Knutson*, 9 Fed. Appx. 706 (2001) (holding digital enhancement of trial photographs is not newly discovered evidence); *State v. Avery*, 345 Wis. 2d 407, 826 N.W.2d 60 (2013) (treating digital enhancements to robbery video as newly discovered evidence but concluding such evidence did not entitle defendant to new trial). See, also, *Cross, supra* note 21 (holding evidence known to defendant at time of trial cannot be newly discovered evidence).

and both experts were able to get the gun to fire after modifying it to accommodate for several missing component parts. But he contends that "based on the newly discovered evidence of the missing magazine release," both the results of the ballistics testing "and the identification of the gun as the murder weapon [are] now clearly unsupported." He contends this is so because evidence of the missing magazine release supports one of two possible inferences: either the recovered gun was modified before it was tested to include a magazine release or the gun that experts tested was not the same one recovered in New Mexico. But as we explain, the newly discovered evidence is not itself material and the inferences from this evidence advanced by Boppre either are not material or are entirely unsupported by any facts in the motion for new trial or supporting documents.

First, evidence of a missing magazine release does nothing to diminish the strength, or the inculpatory nature, of the ballistics testing performed on the gun received into evidence. That testing showed the gun in evidence was the same gun Boppre used for target practice and was the same gun used to kill Valdez and Condon. And the evidence was undisputed that the modifications made to get that gun to fire would not "in any way change what kind of markings would end up on a shell casing or the bullet."

Moreover, even if it is true that the ballistics experts had to modify the gun in ways they did not describe in their testimony in order to get it to fire, such evidence would, at most, serve to impeach their credibility as to how they got the gun to fire. And for newly discovered evidence to be material, it must involve something other than the credibility of witnesses who testified at the former trial.[92]

Finally, there are simply no facts in Boppre's operative motion or supporting documents to support a reasonable inference that the gun tested by the experts was not the same

---

[92] *French, supra* note 30.

gun recovered in New Mexico. Boppre does not challenge the chain of custody evidence regarding the recovered gun; nor does he assert that police, prosecutors, or anyone else swapped the recovered gun for the gun that was tested. In fact, Boppre makes no effort at all to explain how the mud-caked gun that was provided to the experts for ballistics testing might have come into the possession of police if it was not the same one recovered by police in New Mexico.

Simply put, neither the results of the ballistics testing, the admissibility of such test results, nor the reasonable inferences from such evidence would be impacted by evidence of a missing magazine release in the recovered gun. Indeed, even if the ballistics experts had never test-fired the gun in evidence at all, there was still significant ballistics evidence linking Boppre to the crimes, because the shell casings recovered from Boppre's target practice area matched the shell casings recovered from the murder scene.

Because evidence of a missing magazine release in the gun recovered from New Mexico is not so substantial that with it, a different verdict would probably have been reached at trial, the district court did not err in dismissing this claim of newly discovered evidence without an evidentiary hearing.

### (iii) Evidence Gun Reported Stolen

Boppre's operative motion also asserts that in 2019, his investigators discovered a report indicating that sometime before Boppre's trial, the Scotts Bluff County Sherriff's Department was investigating the possible theft of the .32-caliber gun "believed" to have been used to kill Valdez and Condon. Boppre's motion asserts that if he been able to offer evidence at trial that law enforcement "believed that the .32 caliber pistol was stolen from the murder scene, he could have used that . . . to support his claim that the gun was in Valdez's possession prior to the murders." (Emphasis omitted.)

The only supporting document identified for this claim of newly discovered evidence is a printout of the law

enforcement report on which the claim is based. As noted, § 29-2102(1) provides that the only proper supporting documents for a motion asserting newly discovered evidence are affidavits, depositions, or oral testimony. Because Boppre has failed to support this allegation of newly discovered evidence with a proper supporting document, the district court did not err in finding he was not entitled to an evidentiary hearing, and we need not engage in further analysis of this claim.[93]

But even if a proper supporting document had been provided, Boppre would still not be entitled to an evidentiary hearing on this claim, because the evidence is not so substantial that with it, a different verdict probably would have been reached at trial. Evidence that police at one time believed the murder weapon may have been stolen from the scene does not refute evidence that Boppre possessed the weapon either prior to or during the murders. Nor would it negate the overwhelming evidence of Boppre's guilt adduced at trial.

### (iv) Evidence of Jail Records

Boppre's final subcategory of newly discovered evidence pertaining to the gun involves "jail records" that Boppre discovered in 2016, which he alleges show that Niemann was "checked back into the Morrill County, Nebraska Jail at 8:00 a.m. on . . . *the same day that he was supposed to be in New Mexico assisting the 'gun expedition' early that same afternoon*." (Emphasis in original.)

Boppre's operative motion references no competent supporting documents regarding the truth of this evidence, and we need not engage in additional analysis to conclude that it did not entitle him to an evidentiary hearing.[94] But even if he had provided supporting documents, the jail records evidence is not so substantial that with it, a different verdict probably would have been reached at trial. To the contrary, several of

---

[93] See, *Hill, supra* note 21; *Cross, supra* note 21.

[94] See *id.*

the photographs in Boppre's motion depict Niemann at the site in New Mexico when the gun was recovered. As such, while the jail records evidence may call into question the precise time the gun was recovered, it would not refute the photographic evidence and direct testimony showing that Niemann was present and assisting law enforcement when the gun was recovered. Nor would it call into question the overwhelming evidence of Boppre's guilt. The district court did not err in dismissing this claim without an evidentiary hearing.

### (c) Evidence Contradicting
### State's Theories

Boppre's operative motion asserts there are two newly discovered autopsy photographs of Valdez that "go[] directly to the heart of the State's trial case against Boppre." According to the motion, one photograph "directly contradict[s] the State's central theme at trial that . . . Valdez wrote a 'dying declaration' implicating Boppre." And the other photograph shows neck wounds that would have allowed Boppre to present "a credible version of events that included Valdez being held at knife point as he was killed and [show] that multiple assailants were directly involved in the death." We address each photograph in turn.

### (i) Dying Declaration

As noted in our recitation of the trial evidence, there was evidence that the letters "'J-F-F B-O-P-E'" were written on the floor to the left of Valdez' body using white grease and that the letters "'J-E-F-F'" were written on the door casement near Valdez' right hand in what appeared to be blood.[95] Boppre's operative motion asserts that in 2019, his investigators obtained a previously undisclosed photograph taken during Valdez' autopsy that shows him on his back with "a clipboard laying on [his] chest." The motion asserts "this

---

[95] *Boppre I, supra* note 1, 234 Neb. at 929, 453 N.W.2d at 416.

photograph is important newly discovered evidence of the lack of bleeding from the chest wound suffered by Valdez." The clipboard blocks the view of most of Valdez' chest area, but as we understand Boppre's argument, he contends the image is circumstantial evidence that Valdez' chest area was not bloody, because someone set a clipboard there.

The supporting document for this evidence is an affidavit from a forensic medical expert hired by Boppre in 2019 to review the autopsy evidence. This expert opines that in order to write the dying declaration on the floor, Valdez would have had to "roll onto his left side and lean forward," and that this would have caused blood to "exit the [gunshot] wound on the left side of [his] chest." The expert notes that the crime scene photographs show blood pooling under Valdez' back "but not on his chest," and she states that the newly disclosed photograph of the clipboard "confirm[s] the lack of bleeding from this chest wound." The expert opines, based on this lack of bleeding from the chest, that either someone other than Valdez wrote the letters on the floor or Valdez wrote them before he was shot in the chest.

It is not necessary to analyze whether Boppre's motion and supporting documents satisfy all the requirements for an evidentiary hearing on this claim of newly discovered evidence, because we conclude that to the extent the substance of this evidence shows a lack of bleeding from Valdez' chest, it is not newly discovered at all.

[24] Evidence is not "newly discovered" if its substance was known to the defendant at the time of trial.[96] Here, the existing files and record, including the original crime scene photographs and autopsy report, show pooling of blood under Valdez' back, but not on his chest. Evidence that Valdez did not have blood on his chest during the autopsy was thus known to Boppre at the time of trial. Such evidence is not

---

[96] See *Cross, supra* note 21 (counsel's alleged conflict of interest not newly discovered evidence because defendant knew of it at time of trial).

rendered newly discovered just because it is depicted in a recently obtained autopsy photograph.

Moreover, to the extent Boppre argues that the affidavit of his expert is newly discovered evidence, we rejected a similar argument in *Boppre II*, and it can fare no better now. In *Boppre II*, Boppre claimed that the affidavit of a "criminalist" was newly discovered evidence that contradicted the State's theory that Valdez wrote the dying declarations.[97] The criminalist had reviewed the trial evidence and opined that "[b]ecause there was no splattering or blood trail," it was "improbable that Valdez moved himself from where he was shot."[98] The criminalist also opined that "there should have been latent fingerprints in the writings in blood on the doorjamb and in grease on the floor."[99] We concluded these new theories did not represent newly discovered evidence, reasoning that the expert "merely sought to evaluate bits and pieces of the trial evidence favorably to [Boppre]."[100]

We reach the same conclusion here. The affidavit of Boppre's forensic expert merely evaluates known evidence about the bleeding documented on Valdez' body during the autopsy, to advance possible alternative theories that are favorable to Boppre. Because this does not amount to newly discovered evidence, the district court correctly determined that Boppre is not entitled to an evidentiary hearing on this claim.

### (ii) Neck Wounds

Boppre's operative motion asserts that an autopsy negative first discovered in 2019 depicts "with specificity" two knife wounds to the side of Valdez' neck. Boppre contends that if this image had been available at trial, he could have relied on

---

[97] *Boppre II, supra* note 5, 243 Neb. at 919, 503 N.W.2d at 534.

[98] *Id*. at 920, 503 N.W.2d at 534.

[99] *Id*.

[100] *Id*. at 929, 503 N.W.2d at 539.

it to support a defense theory that Valdez was "held at knife point" and that "multiple assailants were directly involved in the death."

As supporting documents for this claim, Boppre points to the affidavits of two medical experts who viewed the photographic image produced from this negative. One of the experts opines that the neck wounds were inflicted at different times—one pre mortem and the other post mortem. The other expert describes the neck wounds as "superficial" and opines that the wounds were inflicted by someone holding Valdez from behind, suggesting the possibility of more than one assailant.

Once again, it is evident from the record that although Boppre claims this photographic image is newly discovered, the substance of the evidence it depicts was known to him at the time of trial. At trial, the State's pathologist testified about the same two neck wounds, describing them as "slicing injuries" "from a thin sharp object of some type." The pathologist testified that both wounds occurred near the time of Valdez' death and acknowledged they could have occurred pre mortem.

The substance of the evidence in the new image depicting the neck wounds is, at best, cumulative of other evidence that was both known to Boppre and produced at trial. The fact that Boppre's new experts reviewed this trial evidence and developed new theories about how Valdez may have been murdered does not make it newly discovered evidence.[101] The district court did not err in denying an evidentiary hearing on this claim.

### (d) Evidence Regarding
### Conflict of Interest

Finally, Boppre's operative motion asserts there is newly discovered evidence that his trial counsel had an "obvious

---

[101] See *id.*

conflict of interest [that] entitles him to a new trial." The motion states that sometime in 2016, Boppre requested and obtained copies of his trial counsel's billing statements from 1989. In reviewing those statements, Boppre discovered that, at one time, his attorney represented "Michael Herman Neu" in a divorce case and a workers' compensation claim. When the State identified Neu as a potential witness in Boppre's criminal trial, Boppre's trial counsel withdrew as Neu's counsel in both civil cases. Boppre's operative motion asserts that "[d]espite knowing that Neu was going to provide damning evidence at trial against Boppre, [trial counsel] never disclosed to anyone that he was not only Boppre's attorney, but he was also Neu's attorney." (Emphasis omitted.)

Boppre's motion references no affidavits, depositions, or oral testimony to support the truth of this newly discovered evidence, and we see none among the supporting documents offered at the records hearing. Because Boppre failed to comply with the supporting document requirement of § 29-2102 in presenting this claim, no further analysis of the assertions in his operative motion is necessary, and it was proper for the district court to dismiss this claim without an evidentiary hearing.[102]

But even if Boppre had complied with the supporting document requirement, we would still conclude it was proper to deny an evidentiary hearing on this claim, because Boppre did not file his motion for new trial within a reasonable time after discovering evidence that his trial counsel had an alleged conflict of interest. Boppre's operative motion does not specify the date on which he discovered this evidence, but it states he discovered the evidence by reviewing "copies of the bill [trial counsel] filed with the trial court for payment as Boppre's court-appointed attorney." Boppre's motion asserts these billing statements were provided in response to a writ of mandamus that was affirmed in relevant part in a

---

[102] See, *Hill, supra* note 21; *Cross, supra* note 21.

memorandum opinion by the Nebraska Court of Appeals in November 2016.[103] It is apparent from the Court of Appeals' opinion that the trial court ordered these billing statements to be provided to Boppre in November 2015, yet Boppre did not file a motion for new trial asserting this newly discovered evidence until December 2018, and his motion asserts no facts justifying the reasonableness of this delay. On this record, we cannot find that the motion was filed within a reasonable time after discovery of the alleged conflict of interest as required by § 29-2103(4). And when a motion for new trial fails to satisfy the statutory timeliness requirements imposed by the Legislature, a court need not consider it further and may dismiss it without an evidentiary hearing.[104]

## V. CONCLUSION

Our de novo review of Boppre's operative motion for new trial and supporting documents shows that he was not entitled to an evidentiary hearing on any of the claims of newly discovered evidence at issue in this appeal. Finding no merit to Boppre's assigned error, we affirm the district court's order dismissing the motion without an evidentiary hearing.

AFFIRMED.

FREUDENBERG, J., not participating.

---

[103] See *Boppre v. Overman*, No. A-15-1135, 2016 WL 6872978 (Neb. App. Nov. 22, 2016) (selected for posting to court website).

[104] See, *Bartel, supra* note 35; *Cross, supra* note 21.